ORIGINAL
FILED

SEP 8 2009

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1   JOEL D. SIEGEL (State Bar No. 155581)
    SONNENSCHEIN NATH & ROSENTHAL LLP
2   601 South Figueroa Street, Suite 2500
    Los Angeles, CA 90017-5704
3   Telephone: (213) 623-9300
    Facsimile: (213) 623-9924
4        jsiegel@sonnenschein.com

5   Attorneys for Defendant
    First American Title Insurance Company         E-filing
6

7

8                   UNITED STATES DISTRICT COURT              PJH

9           FOR THE NORTHERN DISTRICT OF CALIFORNIA

10               SAN FRANCISCO/ OAKLAND DIVISION

11

12   MAPLE LYONS and JERRY LYONS,     CV 09      4156
     individually and on behalf of all others similarly
13   situated

14            Plaintiffs,                    NOTICE OF REMOVAL OF CIVIL ACTION
                                             UNDER 28 U.S.C. § 1441(b)
15        vs.                                (FEDERAL QUESTION JURISDICTION)

16   FIRST AMERICAN TITLE INSURANCE
     COMPANY, a California Corporation, and
17   DOES 1-50, inclusive,

18            Defendants.

19

20

21        TO THE CLERK OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN

22   DISTRICT OF CALIFORNIA:

23        PLEASE TAKE NOTICE that defendant First American Title Insurance Company ("First

24   American") hereby removes the above-captioned action from the Superior Court of the State of

25   California, County of Contra Costa, to this Court pursuant to 28 U.S.C. § 1441(b), 1441(c), and

26   1367(a).  In support thereof, First American states as follows:

27        1.    On July 22, 2008, an action was commenced in the Superior Court of the State of

28   California, County of Contra Costa, entitled *Maple and Jerry Lyons v. First American, individually*

*and on behalf of all others similarly situated, v. First American Title Insurance Company, a*

*California Corporation, and Does 1-50, inclusive*, Case No. C 08-01850. A true and correct copy of

this Complaint is attached as Exhibit A.

2. A true and correct copy of plaintiffs' First Amended Complaint is attached as Exhibit

B.

3. On August 28, 2009, the Court entered an order permitting plaintiffs to file a Second

Amended Complaint, which purports to state a cause of action for violation of 42 U.S.C. § 3601 *et*

*seq.* (the Fair Housing Act). A true and correct copy of this signed order is attached hereto as Exhibit

C.

4. A true and correct copy of plaintiffs' Second Amended Complaint is attached hereto

as Exhibit D. Pursuant to the Court's Order of August 28, 2009, the Second Amended Complaint

was deemed filed on August 28, 2009.

5. Plaintiffs' purported cause of action for violation of 42 U.S.C. § 3601 *et seq.* (the Fair

Housing Act) was not included in plaintiffs' prior complaints. Compare Exhibits A, B, and D.

6. The action is currently pending in the Superior Court for the State of California,

County of Contra Costa, whose venue is embraced by this Court under 28 U.S.C. § 1441(a).

7. This Notice of Removal is timely filed within thirty days of receipt of the "pleading,

motion, order or other paper" from which removability was first ascertained. 28 U.S.C. § 1446(b).

8. True and correct copies of all pleadings, process, and orders in this action are attached

to First American's Appendix in Support of Notice of Removal, filed concurrently herewith pursuant

to 28 U.S.C. § 1446(a).

9. A Notice to Plaintiffs and Attorneys of Record of Removal of Civil Action to United

States District Court is being served by First American upon plaintiffs and filed with the Clerk of the

Superior Court for the State of California, County of Contra Costa. A true and correct copy of the

Notice is attached hereto as Exhibit E.

## JURISDICTION

10. This is a civil action of which this Court has original jurisdiction under 28 U.S.C. §

1331, and is one that may be properly removed to this Court pursuant to the provisions of 28 U.S.C. §

1441(b), in that it alleges claims for relief under the Fair Housing Act (42 U.S.C. § 3601 *et seq.*) which arise under the laws of the United States.

     11.   This Court has supplemental jurisdiction as to all other claims for relief pursuant to 28 U.S.C. § 1367(a) since all such claims allege a common nucleus of operative facts as the claims for relief under 42 U.S.C. § 3601 *et seq.* and are so related to the Fair Housing Act claims that they form part of the same case or controversy under Article III of the United States Constitution.

## INTRADISTRICT ASSIGNMENT

     12.   The action is currently pending in the Superior Court for the State of California, County of Contra Costa, whose venue is embraced by this Court under 28 U.S.C. § 1441(a). Pursuant to local rule 3-2(d), this action shall be assigned to the San Francisco or the Oakland division, as the action arises in Contra Costa County.

Dated: September 8, 2009          SONNENSCHEIN NATH & ROSENTHAL LLP

By: _____
    JOEL D. SIEGEL

Attorneys for Defendant First American Title Insurance Company

Notice of Removal

Exhibit A

*Served upon L. Grushenon*
*4/25/08*

SUM-100

# SUMMONS
## (CITACION JUDICIAL)

**FOR COURT USE ONLY**
*(SOLO PARA USO DE LA CORTE)*

**FILED**

2008 JUL 22 P 1:20

K. TORRE, CLERK OF THE SUPERIOR COURT
COUNTY OF CONTRA COSTA, CALIF.

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
~~FIRST AMERICAN TITLE INSURANCE~~ COMPANY,
a California Corporation, and DOES 1-50, inclusive

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTA DEMANDANDO EL DEMANDANTE):*
MAPLE LYONS and JERRY LYONS,
individually and on behalf of all others similarly situated

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DIAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol) o poniéndose en contacto con la corte o el colegio de abogados locales.*

The name and address of the court is:
*(El nombre y dirección de la corte es):*
Superior Court of Contra Costa County
725 Court Street
Martinez, California 94553

**CASE NUMBER:**
*(Número del caso):* **08 - 01850**

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Mark A. Chavez                                    Telephone: (415) 381-5599
Chavez & Gertler LLP
42 Miller Avenue, Mill Valley, CA 94941

DATE: **JUL 2 2 2008**          Clerk, by    **J. Mvovich**          , Deputy
*(Fecha)*                        *(Secretario)*                    *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify)*:
3. ☑ on behalf of *(specify):* FIRST AMERICAN Title INSURANCE Co. INL.
   under: ☑ CCP 416.10 (corporation)        ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation) ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
          ☐ other *(specify)* :
4. ☑ by personal delivery on *(date)* :

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]
Martin Dean's Essential Forms ™

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465

10450601.tif - 7/22/2008 12:13:48 PM

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*
Mark A. Chavez (Bar No. 90858)
Nance F. Becker (Bar No. 99292)
Chavez & Gertler LLP
42 Miller Avenue, Mill Valley, CA 94941
TELEPHONE NO.: (415) 381-5599   FAX NO.: (415) 381-5572
ATTORNEY FOR *(Name):* Plaintiffs MAPLE LYONS, et al.

FOR COURT USE ONLY

**FILED**

2008 JUL 22  P 1: 20

K. TORRE, CLERK OF THE SUPERIOR COURT
COUNTY OF CONTRA COSTA, CALIF.

SUPERIOR COURT OF CALIFORNIA, COUNTY OF CONTRA COSTA
STREET ADDRESS: 725 Court Street
MAILING ADDRESS:
CITY AND ZIP CODE: Martinez, CA 94553
BRANCH NAME:

CASE NAME: MAPLE LYONS and JERRY LYONS, et al., v.
FIRST AMERICAN TITLE INSURANCE COMPANY

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: |
|---|---|---|
| [X] Unlimited  [ ] Limited (Amount (Amount demanded demanded is exceeds $25,000)  $25,000 or less) | [ ] Counter  [ ] Joinder  Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | **C 08-01850** JUDGE: DEPT: |

*Items 1-6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
[X] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)

**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)

**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)

**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)

**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation**
*(Cal. Rules of Court, rules 3.400-3.403)*
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
[ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [X] is  [ ] is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
a. [ ] Large number of separately represented parties
b. [X] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
c. [X] Substantial amount of documentary evidence
d. [ ] Large number of witnesses
e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. [X] monetary b. [X] nonmonetary; declaratory or injunctive relief  c. [ ] punitive
4. Number of causes of action *(specify):* Two
5. This case [X] is  [ ] is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

**BY FAX**

Date: July 22, 2008

Mark A. Chavez
(TYPE OR PRINT NAME)

(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

CIVIL CASE COVER SHEET

Cal. Rules of Court, rules 2.30, 3.220, 3.400-3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov

Re: Maple Lyons, et al. v. First American Title Insurance Company

Civil Case Cover Sheet

Additional attorneys for plaintiffs:

Bonnett, Fairbourn, Friedman & Balint, PC
Garrett W. Wotkyns (to be admitted *pro hac vice*)
2901 N. Central Avenue, Suite 1000
Phoenix, AZ 85012
Telephone: (602) 274-1100
Facsimile: (602) 274-1199

1   CHAVEZ & GERTLER LLP
    MARK A. CHAVEZ (Bar No. 90858)
2   NANCE F. BECKER (Bar No. 99292)
    42 Miller Ave.
3   Mill Valley, CA  94941
    Telephone: (415) 381-5599
4   Facsimile: (415) 381-5572

5   BONNETT, FAIRBOURN, FRIEDMAN & BALINT, PC
    GARRETT W. WOTKYNS (to be admitted *pro hac vice*)
6   2901 N. Central Avenue, Suite 1000
    Phoenix, AZ 85012
7   Telephone: (602) 274-1100
    Facsimile:  (602) 274-1199

8
    Attorneys for Plaintiffs

9

**FILED**

2008 JUL 22  P 1: 20

K. TORRE, CLERK OF THE SUPERIOR COURT
COUNTY OF CONTRA COSTA, CALIF.

BY: _____

PER LOCAL RULE 5 THIS
CASE IS ASSIGNED TO
DEPT. _____ 6

SUMMONS ISSUED

10              SUPERIOR COURT OF THE STATE OF CALIFORNIA

11                     COUNTY OF CONTRA COSTA

12                       UNLIMITED JURISDICTION

13  MAPLE LYONS and JERRY LYONS,          )  Case No.:  **C 08-01850**
    individually and on behalf of all others )
14  similarly situated,                    )  **CLASS ACTION**
                                            )  **COMPLAINT FOR VIOLATIONS OF**
15              Plaintiffs,                 )  **FAIR EMPLOYMENT AND HOUSING**
                                            )  **ACT, CALIFORNIA GOVERNMENT**
16         vs.                              )  **CODE § 12900 *ET. SEQ.*; AND FOR**
                                            )  **UNLAWFUL BUSINESS PRACTICES,**
17  FIRST AMERICAN TITLE INSURANCE        )  **CALIFORNIA BUSINESS AND**
    COMPANY, a California Corporation, and  )  **PROFESSIONS CODE § 17200 *ET SEQ.***
18  DOES 1-50, inclusive,                  )
                                            )
19              Defendants.                 )  **JURY TRIAL DEMANDED**
                                            )
20                                          )     **BY FAX**

21         Plaintiffs Maple and Jerry Lyons (collectively, "Plaintiffs"), by and through their

22  attorneys, bring this action on behalf of themselves and all other similarly situated California

23  homeowners against Defendant First American Title Insurance Company, Inc. ("First

24  American" or "Defendant") seeking redress for Defendant's racially discriminatory

25  residential title insurance pricing practices under California's Fair Employment and Housing

26  Act ("FEHA"), California Government Code § 12900 *et seq.*, and Business and Professions

27  Code § 17200 *et seq.* ("UCL").  Upon information and belief, as well as the investigation of

28  counsel, Plaintiffs allege as follows:

                                        1
                           CLASS ACTION COMPLAINT

**INTRODUCTION**

1.     This class action seeks relief for Defendant's racially discriminatory residential title insurance sales practices.

2.     As explained further below, Defendant in recent years charged Californians who refinanced their homes with "non-prime" mortgage loans greater amounts for lender's title insurance than Defendant charged those with "prime" mortgage loans.

3.     Given that minority homeowners are overwhelmingly concentrated in the "non-prime" segment of California's mortgage market, this practice predictably caused Defendant's refinancing minority customers to pay disparately more in the aggregate for title insurance than comparably situated non-minority Caucasian customers.  Defendant thus unlawfully discriminated against Plaintiffs and the Class on the basis of their race, national origin and/or ancestry, in violation of California law.

4.     The discriminatory practices Plaintiffs and the Class challenge with this suit were not necessary to the operation of Defendant's business and did not effectively carry out any significant business need of Defendant's.  In fact, upon information and belief, Defendant in 2007 suspended the discriminatory practices in question.  At all material times, feasible alternatives to Defendant's discriminatory practices existed that would have served Defendant's legitimate business purposes (if any) with no less efficacy yet with less discriminatory effects.

5.     On behalf of themselves and a class of all others similarly situated, Plaintiffs ask the Court to declare unlawful Defendant's discriminatory housing practices and award damages and other relief to Plaintiffs and the Class for Defendant's wrongful acts.

**JURISDICTION AND VENUE**

6.     This Court has jurisdiction under Code of Civil Procedure § 410.10.

7.     Venue is proper in the County of Contra Costa because Plaintiffs' causes of action accrued in the County of Contra Costa, and Plaintiffs reside in this County.

8.     Venue is also proper in this County under Civil Code § 1780(c) because Defendant is doing business in this County, a substantial number of Defendant's title

2

1  insurance sales, including Plaintiffs', occurred in this County, and Plaintiffs reside in this

2  County.

3                                     **PARTIES**

4        9.      Plaintiffs Maple and Jerry Lyons are African-American homeowners who

5  reside in the City of Richmond, Contra Costa County, California.  They reside at the property

6  that is the subject of the title insurance policy at issue in this lawsuit.

7        10.     Defendant First American Title Insurance Company, Inc. is a California

8  corporation with its principal place of business in Santa Ana, California.  Defendant is

9  authorized to do business in the State of California and other states and maintains numerous

10 branches and authorized agents throughout California and other states.

11       11.     Defendants DOES 1 through 50 are persons or entities whose true names and

12 identities are presently unknown to Plaintiffs, and who therefore are sued by such fictitious

13 names.  Plaintiffs are informed and believe and thereon allege that each of the fictitiously

14 named Defendants perpetrated some or all of the wrongful acts alleged herein below, are

15 responsible in some manner for the matters alleged herein, and are jointly and severally

16 liable for the acts complained of herein.  Plaintiffs will seek leave of court to amend this

17 complaint to state the true names and capacities of such fictitiously named Defendants when

18 ascertained.

19       12.     At all times mentioned herein, each Defendant was the agent or employee of

20 each of the other Defendants and was acting within the course and scope of such agency or

21 employment.  The Defendants are jointly and severally liable to Plaintiffs, to all others

22 similarly situated, and to the general public.

23                                 **NATURE OF ACTION**

24       13.     This class action challenges Defendant's racially discriminatory sale of

25 lender's policies of residential title insurance in California.

26       14.     Title insurance is indemnity insurance against financial loss from defects in

27 title to real property and from the invalidity or unenforceability of mortgage liens. Lender's

28

                                         3
                             CLASS ACTION COMPLAINT

1  title insurance, the subject of this complaint, protects a lender's financial interest in real

2  property against loss due to title defects, liens or other matters.

3       15.    Title insurance is an unavoidable cost of any residential refinancing

4  transaction. Lenders – who are the beneficiaries of the title policies at issue here even

5  though homeowners pay for them – generally require that title insurance be purchased in

6  order to protect their collateral if a title challenge arises. Without so-called lender's title

7  insurance, lenders generally will not provide a loan to finance or refinance a residential

8  mortgage.

9       16.    California law requires that every title insurer file a rate schedule with the

10  California State Insurance Commissioner. *See* Cal. Ins. Code § 12401.1. Defendant has

11  filed a rate schedule entitled "First American Title Insurance Company; Residential Schedule

12  of Fees" (the "Rate Manual") with the California Department of Insurance that, upon

13  information and belief, was in effect at all times throughout the proposed class period.

14  Plaintiffs take no position concerning the reasonableness of that rate filing and do not

15  challenge it here. Rather, Plaintiffs bring this action to recover damages caused by

16  Defendant's discriminatory application of certain discounts established in its Rate Manual.

17       17.    Few know that title insurers such as Defendant generally price title policies

18  according to a multi-tiered pricing structure. The so-called "basic insurance rate" is, as its

19  name implies, the cornerstone of that pricing structure. Title insurers express their basic

20  insurance rate in terms of premium dollar amount per unit of insurance coverage and use it

21  (in one way or another) to calculate the price for each title insurance policy they sell. In

22  California, Defendant calls its basic insurance rate the "Statewide Basic Insurance Rate; 'A'"

23  (hereinafter referred to as the "Basic Insurance Rate"). Under the terms of Defendant's Rate

24  Manual, California homeowners who purchase title insurance to cover their lenders in

25  connection with home refinancings are entitled to a significant discount on the Basic

26  Insurance Rate as compared to the rate charged for purchase financing. This discount goes

27  by various names, but is most frequently referenced as the "Refinance Rate."

28

4
CLASS ACTION COMPLAINT

18. Across the title insurance industry, Refinance Rates are significantly lower than Basic Insurance Rates because a title insurer performs less work when preparing a refinance title insurance policy than it does when preparing title insurance policies covering lenders who finance initial home purchases. Refinance transactions generally occur when there has been no change in ownership of a property and a short period of time has elapsed between the purchase of the original title insurance policy and the refinance transaction. Refinance policies only insure policyholders for title-related claims that arise during the time in between placement of the policyholder's original policy and the refinance policy. As a result, title insurers typically rely on the comprehensive title search conducted at the placement of the original policy – and thus spend considerably less time and money conducting an updated title search for placement of a refinance policy.

19. Title insurers, including Defendant, have overcharged refinancing homeowners in California and elsewhere for title insurance by selectively applying these Refinance Rate discounts. The Executive Vice President of the title insurance industry's trade association, the American Land Title Association ("ALTA"), has acknowledged publicly that "[w]e know not everyone is familiar" with refinance rate discounts and that "[w]e know [overcharging] is a problem." (Kenneth R. Harney, "Refinancers Should Seek Lower Rate on Title Insurance," The Baltimore Sun, April 13, 2003, p. 1L.) Yet leaders of the title insurance industry, including Defendant, continue to engage in such deceptive and self-serving pricing as a matter of routine business practice.

20. As used in this Complaint, "minority" or "minorities" shall refer to all non-Caucasians and other minority racial groups who are protected under the FEHA, California Government Code § 12900 et seq. As discussed further below, minority homeowners such as Plaintiffs are dramatically concentrated in the "non-prime" mortgage lending market that Defendant singles out for increased premiums.

///
///
///

5
CLASS ACTION COMPLAINT

## DEFENDANT'S SELECTIVE APPLICATION
## OF ITS TITLE INSURANCE DISCOUNTS

21.    Defendant's Rate Manual includes two distinct refinance-related discount provisions that may apply to refinancing homeowners in California: (1) Section C-13(a) provides a substantial discount that can entail more than a 50% reduction from the Basic Insurance Rate; and (2) Section C-13(b) provides a 30% discount from the Basic Insurance Rate.

22.    Defendant has engaged in disparate impact racial discrimination by disproportionately denying the more substantial Refinance Rate discount in Section C-13(a) of its Rate Manual to minority borrowers refinancing their homes.  In accordance with the Rate Manual and as a matter of explicit company policy, Defendant denies the more generous of its Refinance Rate discounts (the one appearing in Section C-13(a)) to refinancing homeowners in cases where Defendant or its agents considers the homeowner's underlying financing to be "non-prime."  To wit, Defendant's Rate Manual states that the Refinance Rate discount "does not apply to non-prime loans[.]"

23.    A wealth of market data – data that is exceedingly well-known throughout the mortgage industry – demonstrates a strong correlation between non-prime mortgage financing and homeowner race and ethnicity.   This data indicates that minorities receive non-prime mortgage financing far more often than do non-minority Caucasians with similar credit and risk characteristics.  In light of this data, Defendant knew or should have known that its policy of denying its full Refinance Rate discount to "non-prime" borrowers would disparately impact minorities purchasing lender's title insurance from Defendant when refinancing their homes – causing them to pay disparately more in the aggregate for the same First American title insurance products purchased by similarly situated non-minority Caucasian customers of First American.

///

///

///

## SYSTEMIC DISCRIMINATION IN AMERICAN MORTGAGE LENDING: A CONTEXT FOR FIRST AMERICAN'S DISCRIMINATORY PRICING PRACTICES

24.     In charging refinancing homeowners with "non-prime" mortgage financing more for lender's title insurance than homeowners with "prime" refinancing, Defendant has effectively created a new species of racial discrimination in America's housing market – a new low, given the long, variegated and well-documented history of race-related discrimination in America's mortgage lending industry. *See* Note, "The Fair Housing Act and Disparate Impact in Homeowners Insurance," 104 Mich. L. Rev. 1993, 1995 (2006) ("Through much of this nation's history, . . . blacks have been subject to a host of discriminatory practices in the housing market"). Such deeply entrenched institutional discrimination against minorities supplies important context for Defendant's title insurance pricing policies and procedures, which disparately impact minority homeowners like the underlying mortgage financing practices to which they are linked in Defendant's application of its title insurance discounts.

25.     The Joint Center for Housing Studies at Harvard University conducted a study in 2005 called "The Dual Mortgage Market: The Persistence of Discrimination in Mortgage Lending." It states that, "[i]n the immediate post-World War II period, racial discrimination in mortgage lending was easy to spot. From government-sponsored racial covenants in the Federal Housing Administration (FHA) guidelines to the redlining practices of private mortgage lenders and financial institutions, minorities were denied access to home mortgages in ways that severely limited their ability to purchase a home. . . . [M]ore than three decades after the enactment of national fair lending legislation, minority consumers continue to have less-than-equal access to loans at the best prices and on the best terms that their credit history, income, and other individual financial considerations merit."

26.     Put simply, homeowner race is a highly significant statistical predictor of who gets high-priced subprime mortgage loans. Baher Amzy, "Squaring the Predatory Lending Circle: A Case for States as Laboratories of Experimentation," 57 Fla. L. Rev. 295, 323 (2005). Analysis by the federal Department of Housing and Urban Development revealed

7

1   that in 1998, over half of all mortgage lending in predominantly African-American

2   neighborhoods was subprime, compared to only nine percent in predominantly Caucasian

3   neighborhoods.  In other words, African-American borrowers based on that data are five

4   times more likely to obtain subprime loans than Caucasian borrowers. *Id.* at 329 (citation

5   omitted).

6        27.    Even where the variable of income is controlled, African-Americans are

7   disproportionately burdened by higher-cost subprime loans. According to HUD, thirty-nine

8   percent of upper-income African Americans refinance with subprime loans, compared to

9   only six percent of upper-income Caucasian borrowers. *Id.* (citation omitted).  Indeed,

10   *upper-income* African Americans are more than two times as likely as *low-income*

11   Caucasians to end up with subprime refinancing. *Id.*

12        28.    A study by the Association of Community Organizations for Reform Now

13   ("ACORN") of sixty-one metropolitan areas demonstrated that 27.6% of all refinance loans

14   to African Americans were subprime, compared to 6.7% subprime refinancing for non-

15   minority Caucasians. http://www.acorn.org/fileadmin/Community_Reinvestment/Reports/

16   S_and_E_2004/separate_and_unequal_2004.pdf (last viewed June 13, 2008).) Latinos, the

17   study found, received 17.1% of refinance loans from subprime lenders. *Id.*

18        29.    The ACORN study reveals that African-Americans are approximately four

19   times as likely as non-minority Caucasians to receive subprime refinance loans (measured

20   across four income categories), while Latinos are between two and two-and-a-half times as

21   likely to get subprime refinancing than non-minority Caucasians across the same income

22   categories.

23        30.    Such figures have long been well-known to Defendant and others in the

24   mortgage industry.  Nonetheless, Defendant – armed with such knowledge – elected to

25   develop and implement a title insurance sales policy directly based on the mortgage lending

26   practices that produced these striking disparities.

27        31.    Defendant during the recent housing boom priced lenders' refinance title

28   insurance policies with reference not just to the size of the underlying mortgage loan (a

1 common industry pricing practice and arguably a race-neutral method of title insurance

2 pricing), but with reference to Defendant's opinion of the *quality* of the financing associated

3 with that loan (a practice that, upon information and belief, is not employed by any other

4 major American title insurer). And, as discussed above, all too frequently the "non-prime"

5 quality of a particular homeowner's mortgage financing is closely correlated with his or her

6 race.

7      32.     In short, by routinely and systematically charging "non-prime" refinancing

8 homeowners more for lender's title insurance than other homeowners, Defendant in violation

9 of California law has caused its minority title insurance purchasers to pay disparately

10 excessive title insurance premiums without any business necessity for doing so.

### DEFENDANT FIRST AMERICAN'S TITLE INSURANCE PRICING PRACTICES DISPARATELY IMPACT HOMEOWNERS

13      33.     Defendant discriminates both by itself and through a network of licensed and

14 authorized title insurance agencies and agents. Authorized title insurance agents and

15 agencies act as Defendant's agents in originating title insurance policies. Authorized title

16 insurance agents and agencies agree with Defendant to originate title insurance policies in

17 accordance with Defendant's Rate Manual and to adhere to Defendant's policies and

18 procedures with respect to pricing title insurance premiums.

19      34.     Defendant and its authorized title insurance agents and agencies designed,

20 implemented, and adhered to title insurance pricing practices that caused minority

21 homeowners in California to purchase title insurance with excessive premiums and higher

22 rates than similarly situated non-minority homeowners. This pattern of discrimination is not

23 the result of random or non-discriminatory factors. Rather, it is a direct result of Defendant's

24 business practices.

25      35.     Defendant implements its discriminatory title insurance pricing policy in a

26 number of ways, including actively educating its licensed title insurance agents and brokers

27 about Defendant's title insurance policies and procedures and systematically denying title

28

CLASS ACTION COMPLAINT

1  insurance refinance discounts to minority homeowners, who are disproportionately numbered

2  among those with "non-prime" mortgage loans.

3      36.  Further, while Defendant's use of a common pricing system for the title

4  insurance policies it sells might appear to be racially neutral, Defendant's denial of its full

5  Refinance Rate discount to "non-prime" homeowners inherently is non-neutral in the way it

6  predictably and adversely affects minority homeowners (relative to similarly situated non-

7  minorities). Minority homeowners are vastly more likely than similarly situated non-

8  minorities to have "non-prime" home mortgage financing. In denying its most generous

9  lender's title insurance discount to "non-prime" homeowners, without requiring any further

10  objective evaluation of their risk profiles, Defendant virtually ensures that its minority

11  customers will pay disparately greater title insurance premiums than similarly situated non-

12  minority customers pay and thereby suffer discriminatory effects from Defendant's title

13  insurance sales practices.

14      37.  The practices complained of herein were not necessary to the operation of

15  Defendant's business and did not effectively fulfill any significant business need. What type

16  of loan a refinancing lender supplies to a homeowner is not a valid or statistically sound

17  predictor of the title insurance risk that particular homeowner poses, and its use by

18  Defendant as a price-setting factor is inexcusable given the well-known correlation between

19  non-prime mortgage financing and race in American mortgage lending and the

20  discriminatory effects of Defendant's practices on Plaintiffs and the Class. At all times

21  material hereto, feasible alternatives to Defendant's discriminatory practices existed that

22  would have equally well or better accomplished Defendant's business purposes with less

23  discriminatory effects.

24      38.  Interestingly, materials concerning title insurance claims developed by the title

25  insurance industry's trade association, the American Land Title Association ("ALTA"),

26  indicate that homeowner loan quality is not a recognized title insurance risk. Defendant is a

27  member of ALTA.

28

10

CLASS ACTION COMPLAINT

39.   Posted on ALTA's Internet site are materials relating to ALTA title insurance "risk codes." As ALTA puts it, "ALTA has developed various risk codes to allow title companies and underwriters to inventory and understand their claims experience, as well as identify trends and problem areas for loss prevention and training purposes." (http://www.alta.org/standards/risk.cfm (last viewed June 10, 2008).) ALTA's risk codes catalog the "Basic Risks" and "Special Risks" its member title insurers (including Defendant) face on incoming title insurance claims. Notably, "non-prime" or "sub-prime" lending is not included among these major title insurance risks.

40.   Title insurance industry claims patterns explain why that is so. The leading insurance industry rating firm A.M. Best Company ("Best") notes that, "title insurance [companies] experience[] a high frequency of low-dollar claims, occasionally generating a severe claim," that title insurance is a "relatively low risk" business and that the "bulk of title insurance claims occur shortly after closing and represent low-dollar costs." (http://www.alta.org/indynews/Research/SR1101title.pdf (last viewed June 10, 2008).) For that reason, the Bloomberg financial news service recently reported that, even though many of America's "non-prime" borrowers today are in default on their loans (and were in 2007), Defendant and other major title insurers paid out less than 20% of their revenues in claims in 2007 "because title insurance claims aren't directly linked to slumping prices or whether mortgages get paid on time." (http://www.bloomberg.com/apps/news?pid=20601203&sid=asmjmzy64wLg&refer=insurance (last viewed June 10, 2008).)

**DEFENDANT FIRST AMERICAN IMPOSED EXCESSIVE AND DISCRIMINATORY PREMIUM CHARGES ON PLAINTIFFS**

41.   Defendant's discriminatory title insurance pricing policy directly damaged Plaintiffs.

42.   On or about August 23, 2005, Plaintiffs refinanced the existing mortgage on their home in Richmond, California. Plaintiffs' lender in their August 23, 2005, refinancing was Countrywide Home Loans, Inc. ("Countrywide").

11

43.     The HUD-I Settlement Statement for Plaintiffs' August 23, 2005, refinancing reflects that Plaintiffs paid off a prior Countrywide loan when they refinanced with Countrywide on August 23, 2005.  Upon information and belief, Lenders Choice Title Company ("Lender's Choice") supplied title insurance in connection with Plaintiffs' August 23, 2005, refinancing.  Upon information and belief, Lender's Choice is an authorized agent for Defendant and conveyed a title insurance policy that was paid for by Plaintiffs and issued and underwritten by Defendant in connection with Plaintiffs' August 23, 2005 home refinancing.

44.     Plaintiffs borrowed $387,200.00 from Countrywide in connection with their August 23, 2005, refinance transaction, and the lender's title insurance policy they purchased from Defendant covered Countrywide up to the amount of their (then-) new mortgage, $387,200.

45.     Plaintiffs' HUD-I Settlement Statement indicates that in connection with their refinancing transaction, Plaintiffs paid a premium of $939.00 for the purchase of lender's title insurance coverage from Defendant.

46.     Upon information and belief, in calculating Plaintiffs' title insurance premium, Defendant (itself or through its agent) determined that Countrywide's terms for providing credit to Plaintiffs in the underlying refinance transaction were "non-prime" and accordingly sold Plaintiffs title insurance without affording them the full Refinance Rate discount set out in Section C-13(a) of Defendant's Rate Manual.  Had Defendant given Plaintiffs the full refinancing premium discount set forth in its Rate Manual, Plaintiffs would have been charged only $550.00 for their policy.

47.     Plaintiffs were damaged by the above-described conduct.

## CLASS ACTION ALLEGATIONS

48.     Plaintiffs bring this class action pursuant to California law on behalf of themselves and all minority customers of Defendant (the "Class") (hereinafter collectively referred to as the "Class" or "members of the Class") in California who: (1)  have purchased lender's title insurance policies from Defendant (2) in connection with the refinancing of

12

1   their homes (3) during the period Defendant's California Rate Manual featuring the §C-13(a)

2   and (b) discounts was in effect ("Class Period"), and (4) to whom Defendant denied the full

3   Refinance Rate discount based on their underlying "non-prime" mortgage financing.

4   Plaintiffs and members of the Class have thus been subjected to disparate impact racial

5   discrimination and unlawful business practices, in violation of California law.

6        49.   Plaintiffs do not know the exact size of the Class or identities of the members

7   of the Class, since that information is in the exclusive control of Defendant. Plaintiffs believe

8   that the Class includes many thousands, or tens of thousands of individuals, who are

9   geographically dispersed throughout California. Therefore, the Class is so numerous that

10   joinder of all members is impracticable.

11        50.   All members of the Class have been subjected to and affected by Defendant's

12   practice of denying its full § C-13(a) Refinance Rate discount to borrowers deemed by

13   Defendant and its agents to have "non-prime" loans in their underlying refinance

14   transactions. There are questions of law and fact that are common to the Class, and that

15   predominate over any questions affecting only individual members of the Class. These

16   questions include, but are not limited to the following:

17          a.   the nature and scope of Defendant's policies and procedures concerning

18       the calculation of title insurance premiums and all applicable refinance discounts

19       available to title insurance applicants engaged in refinance transactions;

20          b.   whether Defendant denied Class Members the full benefit of its Refinance

21       Rate discount and thereby unlawfully discriminated against the Class;

22          c.   whether Defendant discriminated against Class Members by denying

23       the full Refinance Rate discount to homeowners whose underlying financing terms

24       could reasonably be interpreted or evaluated as "prime" in character;

25          d.   whether Defendant's title insurance pricing policies and procedures had a

26       discriminatory impact on minorities;

27

28

e.     whether Defendant's discriminatory practices were necessary to the operation of its business and effectively carried out a significant business need or needs of Defendant;

f.     whether Defendant's title insurance pricing policies and procedures concerning denial of the full Refinance Rate discount to homeowners with "non-prime" financing in refinance transactions have a disparate impact on minority homeowners;

g.     whether Defendant's conduct in charging excessive title insurance premiums to minority homeowners in California refinancing their homes violated the California Fair Employment and Housing Act, California Government Code §12955(i);

h.     whether Defendant's conduct in charging excessive title insurance premiums to minority homeowners in California violated California Business and Professions Code §17200 because it was unlawful in that it violated California Insurance Code §679.1 and/or the FEHA;

i.     whether there are feasible alternatives to Defendant's discriminatory practices that would equally well or better accomplish the business purpose (if any) of Defendant's challenged practices with a less discriminatory effect;

j.     whether the Court can award damages and restitution to Plaintiffs and the Class; and

k.     the proper measure of relief to Plaintiffs and the Class.

51.     Plaintiffs' claims are typical of the claims of the Class, and do not conflict with the interests of any other members of the Class in that both Plaintiffs, and the other members of the Class, were subjected to the same acts of discrimination by Defendant.

52.     Plaintiffs will fairly and adequately represent the interests of the Class. Plaintiffs are committed to vigorous prosecution of the Class's claims, and they have retained attorneys who have extensive experience in consumer protection actions, discrimination actions and class actions.

14

CLASS ACTION COMPLAINT

53. Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

54. A class action is superior to other methods for the speedy and efficient adjudication of this controversy. A class action regarding the issues in this case does not create any problems of manageability.

## ACCRUAL, CONTINUING VIOLATION AND EQUITABLE TOLLING

55. Plaintiffs and Class Members did not know, and could not reasonably have known, that they would receive from Defendant title insurance policies with inflated premiums and discriminatory terms. Their claims did not accrue until shortly before the filing of this action.

56. Defendant's discriminatory conduct was inherently self-concealing. Defendant knew that Plaintiffs and Class Members could not independently determine whether their subject loan financing was deemed "non-prime" by Defendant; in the alternative, Plaintiffs and the Class were unable to understand the discount available to them under the more favorable of Defendant's Refinance Rate discount provisions, and thereby could not independently determine whether or not their title insurance coverage was priced in a discriminatory way relative to that supplied to other refinancing homeowners with similar risk characteristics.

57. As a result of the foregoing, Plaintiffs and Class Members in the exercise of due diligence could not have reasonably discovered the discriminatory practices, and did not do so until just recently. For the reasons alleged above, the un-named members of the Class still do not know that they have been and continue to be injured by Defendant's discriminatory conduct.

58. Defendant's discriminatory conduct is continuing in nature, and Defendant has committed discriminatory acts throughout the limitations period. Class members who bought title insurance from Defendant during the applicable period of limitations continue to be harmed by the excessive and discriminatory title insurance premiums Defendant charged

15

1  them. Plaintiffs in particular continue to be harmed by Defendant's discriminatory

2  overcharging. As Plaintiffs' HUD-I closing statement reflects, Plaintiffs fully financed their

3  excessive and discriminatory title insurance premium payment to Defendant with part of the

4  proceeds of their August 2005 refinance loan from Countrywide. Plaintiffs, in other words,

5  borrowed money from Countrywide (in part) in order to pay Defendant the title insurance

6  premium that is the subject of this lawsuit. Plaintiffs remain mortgagors on said

7  Countrywide mortgage loan today – and Defendant's wrongful acts thus continue to harm

8  Plaintiffs, since each month they pay wrongfully inflated interest on their loan as a result of

9  Defendant's discrimination.

10      59.      There is a substantial nexus between the acts of discrimination occurring

11  within the limitation periods prior to filing suit, and the acts of discrimination before that

12  time. The acts involve the same type of discrimination and are recurring, not isolated,

13  events.

14      60.      Furthermore, Defendant may not invoke any otherwise applicable statutes of

15  limitations because Plaintiffs and members of the Class have been prevented from timely

16  pursuing their claims by sufficiently inequitable circumstances, and any delay on the part of

17  Plaintiffs and the Class in pursuing relief is therefore excusable.

18      61.      The statutes of limitations applicable to any claims that Plaintiffs or other

19  Class Members have brought or could bring as a result of the unlawful and fraudulent

20  concealment and course of conduct described herein, have been tolled as a result of

21  Defendant's fraudulent concealment. In addition, Plaintiffs and the Class did not discover

22  and could not have discovered their causes of action until the time alleged below, thereby

23  tolling any applicable statute of limitations.

24                          **COUNT I**

25              **VIOLATION OF CALIFORNIA FAIR EMPLOYMENT**

26      **AND HOUSING ACT, CALIFORNIA GOVERNMENT CODE §12900, et. seq.**

27      62.      Plaintiffs repeat, re-allege and incorporate the allegations in paragraphs 1

28  through 61 above as if fully set forth herein.

63.     The sale of residential lender's title insurance is a "real estate-related transaction" within the meaning of the FEHA.  Cal. Gov. Code §12927(h)(1). Plaintiffs' home refinancing and their purchase of title insurance from Defendant was such a residential real estate-related transaction.  Defendant is a "business establishment" within the meaning of the FEHA.  Cal. Gov. Code §12955.8(b)(2).

64.     Plaintiffs are African-American residents of California, and are protected on account of their race by California law, including Section 51 of the California Civil Code and FEHA.

65.     The FEHA prohibits discrimination on account of "race, color, religion, sex, sexual orientation, marital status, national origin, ancestry, familial status, source of income, and disability."  Cal. Gov. Code §§12920, 12955.

66.     It is unlawful under FEHA to discriminate on account of the above-described characteristics against any person in making available a real estate related transaction or in the terms and conditions of such transaction. Cal. Gov. Code §12955(i).

67.     Defendant by virtue of transacting substantial business in this County and throughout the State of California is subject to the provisions of Cal. Civ. Code §51.  FEHA also prohibits anyone subject to the provisions of Cal. Civ. Code §51 from discriminating against "any person on the basis of sex, sexual orientation, color, race, religion, ancestry, national origin, familial status, marital status, disability, source of income, or on any other basis prohibited by that section." Cal. Gov. Code §12955(d).

68.     Under Cal. Gov. Code §12955, the definition of the terms "race, color, religion, sex, sexual orientation, marital status, national origin, ancestry, familial status, source of income, and disability" includes a perception that the person has or possesses any of those characteristics or that the person is associated with a person who has, or is perceived to have, any of those characteristics.  Cal. Gov. Code §12955(m).

69.     Further, discrimination as defined by FEHA, includes and prohibits the "provision of inferior terms, conditions, privileges, facilities, or services in connection with [those] housing accommodations." Cal.Gov. Code §12927(c)(1).

17

CLASS ACTION COMPLAINT

70.    Defendant has violated all of these prohibitions with respect to Plaintiffs and the Class by charging minority homeowners with "non-prime" refinancing disparately high amounts for lender's title insurance relative to what Defendant charged non-minority Caucasian title insurance purchasers.  Defendant has discriminated against Plaintiffs and members of the Class concerning their ability to participate in real estate-related transactions and in the terms and conditions of such transactions, in violation of the FEHA.  Cal. Gov. Code §12955(i)

71.    Cal. Gov. Code §12955.8(b) permits injured parties to pursue claims for housing discrimination under the disparate impact theory of liability.  Defendant's title insurance pricing policies and procedures – specifically, Defendant's denial of the full Refinance Rate reduction in premium for lender's title insurance policies purchased by "non-prime" homeowners – had a discriminatory disparate impact upon Plaintiffs and Class Members.

72.    As a proximate result of Defendant's violation of Cal. Gov. Code §§12920 and 12955, Plaintiffs and members of the Class have been directly and proximately injured and are entitled to damages in an amount to be proven at trial.

73.    Plaintiffs and members of the Class ask this Court to declare the rights of the parties herein regarding Defendant's obligation to provide title insurance without discriminating against homeowners on account of their race, and to award Plaintiffs and the Class damages and other relief as prayed for below.

## COUNT II

### VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE SECTION 17200, *et seq.*

74.    Plaintiffs hereby incorporate by reference each and every allegation contained in paragraphs 1 through 73 of this Complaint as if fully rewritten herein.

75.    In selling its title insurance products to Plaintiffs and members of the Class as described above, Defendant and its authorized agents engaged in unlawful business acts within the meaning of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof.

1  Code § 17200 *et seq*. Defendant's failure to deal lawfully with Plaintiffs and the Class

2  Members is part of a regular business practice that violates the UCL.

3      76.  Defendant violated the UCL's prohibition against engaging in unlawful

4  business practices by discriminating against minority title insurance applicants as described

5  herein and thereby violating both California Insurance Code §679.71 and the FEHA, as

6  described above.

7      77.  California Insurance Code § 679.71 prohibits insurers in California from

8  issuing policies "under conditions less favorable to the insured than in other comparable

9  cases, except for reasons applicable alike to persons of every marital status, sex, race, color,

10  religion, national origin, or ancestry." It applies to "policies of insurance" that insure against

11  "[l]oss of or damage to real property which is used primarily for residential purposes" and

12  against "[l]egal liability of a natural person or persons for loss of, damage to, or injury to,

13  persons or property." California Insurance Code § 679.70(a), (c). Plaintiffs and the Class

14  are "insureds" within the meaning of those provisions, and the title insurance policy they

15  purchased from Defendant was a policy of insurance insuring against "[l]oss of or damage to

16  real property which is used primarily for residential purposes" and/or "[l]egal liability of a

17  natural person or persons for loss of, damage to, or injury to, persons or property."

18      78.  Upon information and belief, Defendant issued title insurance policies to

19  Plaintiffs and the Class under conditions that were less favorable to Plaintiffs and the Class

20  than they were to non-minority homeowners in comparable cases for a particular "reason" –

21  presumably, perceived greater title insurance risks associated with the fact of Plaintiffs'

22  "non-prime" refinancing credit. Given the critical mass of well-known industry data closely

23  correlating homeowner "non-prime" refinancing loan quality and homeowner race, that

24  "reason" is not "applicable alike to persons of every marital status, sex, color, religion,

25  national origin, or ancestry."

26      79.  Defendant's title insurance sales practices thus violated California Insurance

27  Code §679.71, the FEHA and the UCL. Plaintiffs and the Class proximately and directly

28  suffered an ascertainable loss as a result of these violations in an amount to be proved at trial.

**PRAYER FOR RELIEF**

WHEREFORE PREMISES CONSIDERED, Plaintiffs request the following relief:

1.  An order determining that this action is a proper class action;

2.  A judgment awarding Plaintiffs and Class Members compensatory damages according to proof;

3.  A judgment granting Plaintiffs and Class Members restitution for their losses;

4.  An order finding and declaring that Defendant's acts and practices as challenged herein are unlawful;

5.  A judgment awarding Plaintiffs and Class Members costs and disbursements incurred in connection with this action, including reasonable attorneys' fees, costs and expenses; and

6.  A judgment or other order granting such other and further relief as the Court deems just and proper.

DATED:  July 22, 2008

CHAVEZ & GERTLER LLP

BONNETT, FAIRBOURN, FRIEDMAN & BALINT PC

By: _____
          Mark A. Chavez

Attorneys for Plaintiffs
MAPLE LYONS and JERRY LYONS

///
///
///
///

## JURY DEMAND

Plaintiffs hereby demand a trial by jury of the maximum number allowed by law.

DATED:  July 22, 2008

CHAVEZ & GERTLER LLP

BONNETT, FAIRBOURN, FRIEDMAN & BALINT PC

By: _____
        Mark A. Chavez

Attorneys for Plaintiffs
MAPLE LYONS and JERRY LYONS

CLASS ACTION COMPLAINT

SUPERIOR COURT – MARTINEZ
COUNTY OF CONTRA COSTA
MARTINEZ, CA  94553

LYONS VS FIRST AMERICAN TITLE INSURANCE

MSC08-01850

NOTICE OF ASSIGNMENT TO DEPARTMENT SIX FOR CASE
MANAGEMENT DETERMINATION

THIS FORM, A COPY OF THE NOTICE TO PLAINTIFFS, THE ADR INFORMATION
SHEET, AND A BLANK CASE MANAGEMENT STATEMENT ARE TO BE SERVED
UPON ALL OPPOSING PARTIES, ALL PARTIES SERVED WITH SUMMONS AND
COMPLAINT/CROSS-COMPLAINT.

1. This matter has been assigned to Department 6, Judge D. Flinn
presiding, for all purposes, Department 6 is designated as the complex
litigation department of the Court and as such (a) hears all cases
wherein a designation of complex case has been made and (b) conducts
hearings, in cases that this court determines, on a preliminary basis
may be complex, to determine whether the case should remain in the
complex litigation program.

2. All counsel are required to appear in Dept. 6 on 09/23/08
   at 8:30am.
      (a) If the case has been designated as complex, and no counter-
          designation has been filed, the Court will hold its first
          case management conference at that time.
      (b) If the case has been assigned to Department 6 on a
          preliminary basis the Court will hold a hearing to determine
          if the matter is, or is not, complex.  If the matter is
          determined to be complex, the Court will then proceed with
          the first case management conference.

3. Each party shall file and serve a Case Management Conference
Statement five (5) days before this hearing and be prepared to
participate effectively in the Conference, including being thoroughly
familiar with the case and able to discuss the suitability of the case
for private mediation, arbitration or the use of a special master or
referee.

4. Prior to the conference counsel for plaintiff shall meet and confer
with counsel for each other party in an effort to precisely define the
the issues in the case, discuss the possiblity of early mediation, the
identities of possible other parties, and their respective plans for
discovery.

5. Until the time of the conference the following INTERIM ORDERS shall
be in effect:

   A. Plaintiff shall diligently proceed in locating and serving each
      and every defendant.  It is the Court's intention that each party
      be served in sufficent time to have entered an appearance within
      the time allowed by law and to attend the first conference.
   B. All discovery shall be stayed excepting as all parties to the
      action might otherwise stipulate or the Court otherwise order.
   C. No party shall destroy any writing or other evidence in its
      possession or under its control which bears in any way upon the
      matters which are the subject of this litigation.

D. Within the time for any party to file an answer or demurrer such party may alternatively file a notice of general appearance. In such event the time for filing of an answer or demurrer shall be extended to twenty (20) days following the first conference unless the Court shall, at that time, set a different schedule.

E. Counsel for each party shall do a conflict check to determine whether such counsel might have a possible conflict of interest as to any present or contemplated future party.

BY ORDER OF THE COURT



## CONTRA COSTA COUNTY SUPERIOR COURT
## ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION

All judges in the Civil Trial Delay Reduction Program agree that parties should consider using Alternative Dispute Resolution (ADR) to settle their cases. To tell the court you will use ADR:

- Choose ADR on the *Case Management Form* (CM-110);
- File a *Stipulation and Order to Attend ADR and Continue First Case Management Conference 90-Days* (local court form); or
- Agree to ADR at your first court appearance.

### *Questions? Call (925) 957-5787, or go to www.cc-courts.org/adr*

### MEDIATION

Mediation is often faster and less expensive than going to trial. Mediators help people who have a dispute talk about ways they can settle their case. Parties call or visit the ADR Programs office to get a list of mediators. After parties have agreed on a mediator, they must write a summary (5 pages or less) explaining the facts, legal arguments, and legal authority for their position. They must send this summary to the other parties and the mediator at least 5 court days before mediation starts.

ALL parties and attorneys must go to mediation. Mediation can be held whenever and wherever the parties and the mediator want, as long as they finish before the court deadline. In some kinds of court cases, parties have the chance to mediate in the courthouse on their trial day.

Most mediators begin by talking with the parties together, helping them focus on the important issues. The mediator may also meet with each party alone. Mediators often ask parties for their ideas about how to settle the case. Some mediators tell the parties how much money they think a case is worth, or tell them what they think might happen if the case went to trial. Other mediators help the parties decide these things for themselves. No matter what approach a mediator takes, decisions about settling a case can only be made when all the parties agree.

If the parties go through the court ADR program, mediators do not charge fees for the first half hour spent scheduling or preparing for mediation. They also do not charge fees for the first two hours of mediation. If parties need more time, they must pay that person's regular fees. Some mediators ask for a deposit before mediation starts. Mediators who do this must give back whatever is left after counting the time he or she spent preparing for or doing the mediation. A party whose court fees have been waived (cancelled) may ask if their mediation fees or deposit can be waived.

If parties agree about how they will settle their case, they can choose to keep it private, write it up as a contract, or ask the judge to make it a court order. What parties say and agree to in mediation is confidential (private).

### PRIVATE MEDIATION

Private mediation works in the same way as judicial mediation, but the parties do not go through the ADR Programs office. Parties choose a mediator on their own, and pay the mediator's normal fees.

CV-655c/Rev. 05/2007

## JUDICIAL ARBITRATION (non-binding)

In judicial arbitration, an independent attorney (arbitrator) looks at the evidence, listens to the parties and their witnesses, and decides how the case will be settled. Judicial arbitration is less formal than court. Parties call or visit the ADR Programs office to get a list of arbitrators. If they cannot agree on an arbitrator, the court will assign one. The judge can send cases to arbitration if there is less than $50,000 in dispute. The person who started the court case can make sure the case goes to arbitration if they agree to limit the amount they are asking for to $50,000. Parties can also agree they want to use judicial arbitration. The arbitrator must send their decision (award) to the court within 10 days of the last hearing. The award becomes a court judgment unless a party asks the court to review the case within 30 days. Parties must use the ADR 102 form to ask for a new court hearing (called a trial de novo.) Judicial arbitrators charge $150 per case or per day.

## PRIVATE ARBITRATION (non-binding and binding)

Private, non-binding arbitration is the same as judicial arbitration, except that the parties do not go through the ADR Programs office to choose an arbitrator, and the arbitrator's award will not become a judgment of the court unless all parties agree. Parties must pay the arbitrator's normal fees.

Binding arbitration is different from judicial or private non-binding arbitration because the arbitrator's decision is final. Parties give up their right to have a judge review their case later (except for reasons listed in California Code of Civil Procedure, Section 1286.2.) Binding arbitration rules are listed in California Code of Civil Procedure, Sections 1280-1288.8. Parties may also agree any time before the judge has made a decision that ends the case to switch to binding arbitration. Parties choose the arbitrator on their own, and must pay the arbitrator's normal (not $150) fees.

## SETTLEMENT MENTOR CONFERENCE

Settlement mentors are independent, experienced trial attorneys that a judge has assigned to help parties look for ways to settle their case. The conference is free and is held in the courthouse. It is often held on the morning of trial, but it can be scheduled anytime. These conferences usually last two or three hours. Parties do not present evidence and do not call witnesses. Parties can ask the settlement mentor to keep some information confidential (private) from the other party, but not from the judge. The settlement mentor can share any information with the judge, or involve the judge in settlement discussions. All principals, clients, and claims representatives must attend the settlement mentor conference.

## NEUTRAL CASE EVALUATION

In neutral case evaluation, an independent attorney (evaluator) reviews documents and listens to each party's side of the case. The evaluator then tells the parties what they think could happen if the case went to trial. Many people use the evaluator's opinion to reach an agreement on their own, or use this information later in mediation or arbitration to settle their case.

Parties call or visit the ADR Programs office to get a list of evaluators. After parties have agreed on an evaluator, they must write a summary (5 pages or less) explaining the facts, legal arguments, and legal authority for their position. They must send this summary to the other parties and the evaluator at least 5 court days before evaluation starts. ALL parties and their attorneys must go to neutral case evaluation. The evaluation can be held whenever and wherever the parties and the evaluator want, as long as they finish before the court deadline. If the parties go through the court's ADR program, evaluators do not charge any fees for the first half hour spent scheduling or preparing for the evaluation conference. They also do not charge fees for the first two hours of the evaluation. If parties need more time, they must pay that person's regular fees. Some evaluators ask for a deposit before evaluation starts. Evaluators who do this must give back whatever is left after counting the time he or she spent preparing for or doing the evaluation. A party whose court fees have been waived (cancelled) may ask if their evaluation fees or deposit can be waived.

## TEMPORARY JUDGE

Some parties want a trial, but want to choose who will decide the case and when the trial will take place. Parties can agree on an attorney that they want the court to appoint as a temporary judge for their case. (See Article 6, Section 21 of the State Constitution and Rule 2.830 of the California Rules of Court.) Temporary judges have nearly the same authority as a superior court judge to conduct a trial and make decisions. As long as the parties meet the court deadline, they can schedule the trial at their own and the temporary judge's convenience.

Each of the temporary judges on the court's panel has agreed to serve at no charge for up to 5 court days. If the parties need more time, they must pay that person's regular fees. All parties and their lawyers must attend the trial, and provide a copy of all briefs or other court documents to the temporary judge at least two weeks before the trial. These trials are similar to other civil trials, but are usually held outside the court. The temporary judge's decision can be appealed to the superior court. There is no option for a jury trial. The parties must provide their own court reporter.

## SPECIAL MASTER

A special master is a private lawyer, retired judge, or other expert appointed by the court to help make day-to-day decisions in a court case. The special master's role can vary, but often includes making decisions that help the discovery (information exchange) process go more smoothly. He or she can make decisions about the facts in the case. Special masters can be especially helpful in complex cases. The trial judge defines what the special master can and cannot do in a court order.

Special masters often issue both interim recommendations and a final report to the parties and the court. If a party objects to what the special master decides or reports to the court, that party can ask the judge to review the matter. In general, the parties choose (by stipulation) whom they want the court to appoint as the special master, but there are times (see California Code of Civil Procedure Section 639), when the court may appoint a special master or referee without the parties' agreement. The parties are responsible to pay the special master's regular fees.

## COMMUNITY MEDIATION SERVICES

Mediation Services are available through non-profit community organizations. These low-cost services are provided by trained volunteer mediators. For more information about these programs contact the ADR Program at (925) 957-5787

### Superior Court of California, County of Contra Costa

## NOTICE TO DEFENDANTS
### In Unlimited Jurisdiction Civil Actions

**YOU ARE BEING SUED.** The packet you have been served should contain:

   a.   The Summons
   b.   The Complaint
   c.   The Notice of Case Management (shows hearing date and time)
   d.   Blank: Case Management Statement (Judicial Council Form CM-110)
   e.   Blank: Stipulation and Order to Attend ADR and Delay First Case Management Conference 90 Days (Local Court Form CV-655b)
   f.   Alternative Dispute Resolution (ADR) Information  (Local Court Form CV-655c)

---

 **WHAT DO I DO NOW?** 

**You must:**

1. **Prepare your response**   YOU COULD LOSE YOUR CASE—even before it is heard by a judge or before you can defend yourself, if you do not prepare and file a response on time. See the other side of this page for types of responses you can prepare.

2. **Complete the** *Case Management Statement  (CM-110)*

3. **File and serve your court papers on time**   Once your court forms are complete, you must file 1 original and 2 copies of the forms at court. An adult who is NOT involved in your case must serve one set of forms on the Plaintiff. If you were served in person you must file your response in 30 days. If the server left a copy of the papers with an adult living at your home or an adult in charge at your work or you received a copy by mail you must file your response in 40 days.

4. **Prove you served your court papers on time**   by having your server complete a *Proof of Service, (Judicial Council form POS-040)*, that must be filed at the court within 60 days.

5. **Go to court** on the date and time given in the *Notice of Case Management Conference.*

6. **Consider trying to settle your case before trial**   If you and the other party to the case can agree to use mediation, arbitration or neutral case evaluation, the *Stipulation and Order to Attend ADR and Delay First Case Management Conference 90 Days* can be filed with your other papers.  For more information read the enclosed ADR information, visit www.cc-courts.org/adr, or call (925) 957-5787.

**IMPORTANT! The court recommends consulting an attorney for all or part of your case.  While you may represent yourself, lawsuits can be complicated, and the court cannot give you legal advice.**

---

**COURT FEES:** You must pay court fees the first time you file your papers.  If you also file a motion, you must pay another fee.  If you cannot afford the fees, you may ask the court to waive (allow you not to pay) fees. Use Judicial Council forms FW-001-INFO [information sheet]; FW-001 [application]; and FW-003 [order].

**COURT FORMS:** Buy forms at the Forms Window in the Family Law Building or download them for free at: www.courtinfo.ca.gov/forms/

## WHAT KIND OF RESPONSES CAN I FILE?

1. If you disagree with some or all of what the plaintiff says in the complaint because you believe, or know it is not true, you can file an <u>ANSWER</u>.

2. If you have a claim in the same case against the plaintiff, you may file a <u>CROSS-COMPLAINT</u>.

3. If you want to ask the court to do something on your behalf, you may file a <u>MOTION</u> *(See TYPES OF MOTIONS below)*

## HOW DO I PREPARE AN ANSWER?

There are two kinds of Answers you can use, depending on whether the Complaint was verified. You can tell if a Complaint is verified because it says "Verified Complaint" and/or has a signed oath on the last page.

**For complaints that are NOT verified:**

> Use Judicial Council form PLD-050 – General Denial

**For complaints that ARE verified:**

> a. For personal injury, property damage, and wrongful death claims, use Judicial Council PLD-PI-003 (do <u>not</u> check number 2).
>
> b. For contract claims, use Judicial Council PLD-C-010 (do <u>not</u> check number 3a).
>
> c. Be sure to deny <u>every</u> claim with which you disagree. For example, you might write: *"I believe, or know, that the information in paragraph #__ is untrue/incorrect."* Continue your list until you have addressed each paragraph in the Complaint.

**NOTE:** The Judicial Council Answer forms have spaces for your affirmative defenses. Be sure to include them or you may not be able to use them later. To find out what your affirmative defenses might be, go to the law library and ask the librarian to help you find the information you need.

**If you want to file a Cross-Complaint, you must do so at the same time you file the Answer.**

> a. For a personal injury, property damage, and/or wrongful death Cross-Complaint, use Judicial Council form PLD-PI-002.
>
> b. For a contract Cross-Complaint, use Judicial Council PLD-C-001.

## TYPES OF MOTIONS

Written motions are documents that ask the court to do something. You may have to file an *Answer* at the same time. At this point in the case, you can only make Motions from the following list:

1. <u>Demurrer</u> *(the facts stated in the complaint are wrong, or the deadline to file the lawsuit has passed);*
2. <u>Motion to Strike</u> *(the complaint is unclear; does not follow the law, "doesn't matter", etc.);*
3. <u>Motion to Transfer</u> *(the complaint is in the wrong court or there's a more appropriate court);*
4. <u>Motion to Quash Service of Summons</u> *(you were not legally served);*
5. <u>Motion to Stay</u> *(put the case on hold);* or
6. <u>Motion to Dismiss</u> *(stops the case).*

**NOTE: Motions are very complicated and you may want to hire a lawyer to help you.**

## WHERE CAN I GET MORE HELP?

- **Lawyer Referral Service:** (925) 825-5700
- **Bay Area Legal Aid:** (800) 551-5554
- **Contra Costa County Law Library**      Martinez: (925) 646- 2783      Richmond: (510) 374-3019
- **Ask the Law Librarian:**   www.247ref.org/portal/access_law3.cfm

# SUPERIOR COURT OF THE STATE OF CALIFORNIA
# IN AND FOR THE COUNTY OF CONTRA COSTA

_____

_____
Plaintiff(s)

vs.

_____

_____
Defendant(s)

### _Stipulation and Order_ to Attend ADR and Delay _First Case Management Conference 90 Days_

Case No.:_____ Date complaint filed: _____ First case management conference set for: _____

---

▸ **ALL PARTIES MUST SIGN THIS FORM** AND FILE THIS STIPULATION, WITH CASE MANAGEMENT STATEMENTS, AT LEAST 15 DAYS BEFORE THE FIRST CASE MANAGEMENT CONFERENCE

▸ PARTIES MUST ALSO SEND A COPY OF THE FORM WITH THE JUDGE'S SIGNATURE TO THE ADR OFFICE: FAX: (925) 957-5689 or MAIL: P.O. BOX 911, MARTINEZ, CA 94553

▸ THIS STIPULATION **MAY NOT** BE USED IN COMPLEX LITIGATION CASES

---

**Counsel and all parties certify they have met and conferred on the subjects set forth in Rule of Court 212(b), and have selected the following alternative dispute resolution (ADR) process: [check ☑one]:**

☐ Judicial mediation          ☐ Judicial arbitration          ☐ Neutral case evaluation

☐ Private mediation          ☐ Private arbitration

**COUNSEL AND ALL PARTIES AGREE TO COMPLETE ADR WITHIN 90 DAYS, AND CERTIFY:**

1. This is not a complex civil case (as described in California Rules of Court, Rule 3.400);
2. All parties have been served and intend to submit to the jurisdiction of the court;
3. All parties have agreed to a specific plan for sufficient discovery to make the ADR process meaningful;
4. Defendant(s)' first appearance fee has been paid or will be submitted with this Stipulation;
5. Copies of this Stipulation and self-addressed stamped envelopes are provided for returning file-stamped copies to counsel and the parties;
6. Case Management Conference Statements are submitted with this Stipulation;
7. All parties will attend ADR conferences as required by local court rule (Appendix C); and,
8. All parties know the court will not allow more than 90 days to complete ADR.

_____|_____          _____|_____
Counsel for Plaintiff _(print)_          Fax          Counsel for Defendant _(print)_          Fax

_____          _____
Signature          Signature

_____|_____          _____|_____
Counsel for Plaintiff _(print)_          Fax          Counsel for Defendant _(print)_          Fax

_____          _____
Signature          Signature

---

Pursuant to the Stipulation of the parties, and subject to the _Case Management Order_ to be filed, **IT IS SO ORDERED** that the Case Management Conference set for _____ is vacated and rescheduled for _____ at (8:30 a.m. / _____) **Plaintiff's counsel must notify all parties of the case management conference.**

Dated: _____          _____
                                        _Judge of the Superior Court_

---

CV-655b/Rev. 05/2007          Local Court Rules, Rule 5 (h)(1)(a)(5)

CM-110

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| TELEPHONE NO.:                    FAX NO. *(Optional):* | |
| E-MAIL ADDRESS *(Optional):* | |
| ATTORNEY FOR *(Name):* | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF

STREET ADDRESS:

MAILING ADDRESS:

CITY AND ZIP CODE:

BRANCH NAME:

PLAINTIFF/PETITIONER:

DEFENDANT/RESPONDENT:

| **CASE MANAGEMENT STATEMENT** | CASE NUMBER: |
|---|---|
| **(Check one):** ☐ **UNLIMITED CASE** (Amount demanded exceeds $25,000) ☐ **LIMITED CASE** (Amount demanded is $25,000 or less) | |

A CASE MANAGEMENT CONFERENCE is scheduled as follows:

Date:                    Time:                    Dept.:                    Div.:                    Room:

Address of court *(if different from the address above):*

**INSTRUCTIONS: All applicable boxes must be checked, and the specified information must be provided.**

1. **Party or parties** *(answer one):*
   a. ☐ This statement is submitted by party *(name):*
   b. ☐ This statement is submitted **jointly** by parties *(names):*

2. **Complaint and cross-complaint** *(to be answered by plaintiffs and cross-complainants only)*
   a. The complaint was filed on *(date):*
   b. ☐ The cross-complaint, if any, was filed on *(date):*

3. **Service** *(to be answered by plaintiffs and cross-complainants only)*
   a. ☐ All parties named in the complaint and cross-complaint have been served, or have appeared, or have been dismissed.
   b. ☐ The following parties named in the complaint or cross-complaint
      (1) ☐ have not been served *(specify names and explain why not):*

      (2) ☐ have been served but have not appeared and have not been dismissed *(specify names):*

      (3) ☐ have had a default entered against them *(specify names):*

   c. ☐ The following additional parties may be added *(specify names, nature of involvement in case, and the date by which they may be served):*

4. **Description of case**
   a. Type of case in ☐ complaint ☐ cross-complaint    *(describe, including causes of action):*

| Form Adopted for Mandatory Use Judicial Council of California CM-110 [Rev. January 1, 2007] | **CASE MANAGEMENT STATEMENT** | Cal. Rules of Court, rules 3.720–3.730 www.courtinfo.ca.gov |
|---|---|---|

American LegalNet, Inc.
www.FormsWorkflow.com

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

4. b. Provide a brief statement of the case, including any damages. *(If personal injury damages are sought, specify the injury and damages claimed, including medical expenses to date [indicate source and amount], estimated future medical expenses, lost earnings to date, and estimated future lost earnings. If equitable relief is sought, describe the nature of the relief.)*

☐ *(If more space is needed, check this box and attach a page designated as Attachment 4b.)*

5. **Jury or nonjury trial**
The party or parties request ☐ a jury trial ☐ a nonjury trial *(if more than one party, provide the name of each party requesting a jury trial):*

6. **Trial date**
a. ☐ The trial has been set for *(date):*
b. ☐ No trial date has been set. This case will be ready for trial within 12 months of the date of the filing of the complaint *(if not, explain):*

c. Dates on which parties or attorneys will not be available for trial *(specify dates and explain reasons for unavailability):*

7. **Estimated length of trial**
The party or parties estimate that the trial will take *(check one):*
a. ☐ days *(specify number):*
b. ☐ hours (short causes) *(specify):*

8. **Trial representation** *(to be answered for each party)*
The party or parties will be represented at trial ☐ by the attorney or party listed in the caption ☐ by the following:
a. Attorney:
b. Firm:
c. Address:
d. Telephone number:
e. Fax number:
f. E-mail address:
g. Party represented:
☐ Additional representation is described in Attachment 8.

9. **Preference**
☐ This case is entitled to preference *(specify code section):*

10. **Alternative Dispute Resolution (ADR)**
a. Counsel ☐ has ☐ has not provided the ADR information package identified in rule 3.221 to the client and has reviewed ADR options with the client.
b. ☐ All parties have agreed to a form of ADR. ADR will be completed by *(date):*
c. ☐ The case has gone to an ADR process *(indicate status):*

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

**10. d.** The party or parties are willing to participate in *(check all that apply):*

    (1) ☐ Mediation

    (2) ☐ Nonbinding judicial arbitration under Code of Civil Procedure section 1141.12 (discovery to close 15 days before arbitration under Cal. Rules of Court, rule 3.822)

    (3) ☐ Nonbinding judicial arbitration under Code of Civil Procedure section 1141.12 (discovery to remain open until 30 days before trial; order required under Cal. Rules of Court, rule 3.822)

    (4) ☐ Binding judicial arbitration

    (5) ☐ Binding private arbitration

    (6) ☐ Neutral case evaluation

    (7) ☐ Other *(specify):*

  **e.** ☐ This matter is subject to mandatory judicial arbitration because the amount in controversy does not exceed the statutory limit.

  **f.** ☐ Plaintiff elects to refer this case to judicial arbitration and agrees to limit recovery to the amount specified in Code of Civil Procedure section 1141.11.

  **g.** ☐ This case is exempt from judicial arbitration under rule 3.811 of the California Rules of Court *(specify exemption):*

**11. Settlement conference**

  ☐ The party or parties are willing to participate in an early settlement conference *(specify when):*

**12. Insurance**

  **a.** ☐ Insurance carrier, if any, for party filing this statement *(name):*

  **b.** Reservation of rights: ☐ Yes ☐ No

  **c.** ☐ Coverage issues will significantly affect resolution of this case *(explain):*

**13. Jurisdiction**

Indicate any matters that may affect the court's jurisdiction or processing of this case, and describe the status.

  ☐ Bankruptcy ☐ Other *(specify):*

Status:

**14. Related cases, consolidation, and coordination**

  **a.** ☐ There are companion, underlying, or related cases.

    (1) Name of case:

    (2) Name of court:

    (3) Case number:

    (4) Status:

  ☐ Additional cases are described in Attachment 14a.

  **b.** ☐ A motion to ☐ consolidate ☐ coordinate will be filed by *(name party):*

**15. Bifurcation**

  ☐ The party or parties intend to file a motion for an order bifurcating, severing, or coordinating the following issues or causes of action *(specify moving party, type of motion, and reasons):*

**16. Other motions**

  ☐ The party or parties expect to file the following motions before trial *(specify moving party, type of motion, and issues):*

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

**17. Discovery**
   a. ☐ The party or parties have completed all discovery.
   b. ☐ The following discovery will be completed by the date specified *(describe all anticipated discovery):*

   | Party | Description | Date |
   |---|---|---|
   | | | |

   c. ☐ The following discovery issues are anticipated *(specify):*

**18. Economic Litigation**
   a. ☐ This is a limited civil case (i.e., the amount demanded is $25,000 or less) and the economic litigation procedures in Code of Civil Procedure sections 90 through 98 will apply to this case.
   b. ☐ This is a limited civil case and a motion to withdraw the case from the economic litigation procedures or for additional discovery will be filed *(if checked, explain specifically why economic litigation procedures relating to discovery or trial should not apply to this case):*

**19. Other Issues**
   ☐ The party or parties request that the following additional matters be considered or determined at the case management conference *(specify):*

**20. Meet and confer**
   a. ☐ The party or parties have met and conferred with all parties on all subjects required by rule 3.724 of the California Rules of Court *(if not, explain):*

   b. After meeting and conferring as required by rule 3.724 of the California Rules of Court, the parties agree on the following *(specify):*

**21. Case management orders**
   Previous case management orders in this case are *(check one):*   ☐ none   ☐ attached as Attachment 21.

**22. Total number of pages attached *(if any):* _____**

I am completely familiar with this case and will be fully prepared to discuss the status of discovery and ADR, as well as other issues raised by this statement, and will possess the authority to enter into stipulations on these issues at the time of the case management conference, including the written authority of the party where required.

Date:

_____              ▶ _____
(TYPE OR PRINT NAME)                                    (SIGNATURE OF PARTY OR ATTORNEY)

_____              ▶ _____
(TYPE OR PRINT NAME)                                    (SIGNATURE OF PARTY OR ATTORNEY)
                                                        ☐ Additional signatures are attached

CM-110 [Rev. January 1, 2007]                   **CASE MANAGEMENT STATEMENT**                   Page 4 of 4

Exhibit B

1   CHAVEZ & GERTLER LLP
    MARK A. CHAVEZ (Bar No. 90858)
2   NANCE F. BECKER (Bar No. 99292)
    42 Miller Ave.
3   Mill Valley, CA 94941
    Telephone: (415) 381-5599
4   Facsimile: (415) 381-5572

5   SCHNEIDER WALLACE COTTRELL BRAYTON KONECKY LLP
    GARRETT WOTKYNS (admitted *pro hac vice*)
6   7702 East Doubletree Ranch Road, Ste. 300
    Scottsdale, AZ 85258
7   Telephone: (480) 607-4368
    Facsimile: (480) 348-3999

8

9   SCHNEIDER WALLACE COTTRELL BRAYTON KONECKY LLP
    MARK T. JOHNSON (Bar No 76904)
10  180 Montgomery St., Ste. 2000
    San Francisco, CA 94104
    Telephone: (415) 421-7100
11  Facsimile: (415) 421-7105

12  BONNETT, FAIRBOURN, FRIEDMAN & BALINT, PC
    ANDREW FRIEDMAN (admitted *pro hac vice*)
13  2901 N. Central Avenue, Suite 1000
    Phoenix, AZ 85012
14  Telephone: (602) 274-1100
    Facsimile: (602) 274-1199

15

    Attorneys for Plaintiffs
16

17          SUPERIOR COURT OF THE STATE OF CALIFORNIA

18              COUNTY OF CONTRA COSTA

19               UNLIMITED JURISDICTION

| | |
|---|---|
| 20  MAPLE LYONS and JERRY LYONS, individually and on behalf of all others similarly situated, | Case No.: C 08-01850 |
| 21 | **CLASS ACTION** |
| 22         Plaintiffs, | **FIRST AMENDED COMPLAINT FOR VIOLATIONS OF FAIR EMPLOYMENT AND HOUSING ACT, CALIFORNIA GOVERNMENT CODE § 12900, *ET. SEQ.*; AND FOR UNLAWFUL BUSINESS PRACTICES, CALIFORNIA BUSINESS AND PROFESSIONS CODE § 17200, *ET. SEQ.*** |
| 23        vs. | |
| 24 | |
| 25  FIRST AMERICAN TITLE INSURANCE COMPANY, a California Corporation, and DOES 1-50, inclusive, | |
| 26 | |
| 27        Defendants. | **Dept. 09: Hon. Judith Craddick** |
| 28 | **JURY TRIAL DEMANDED** |

FIRST AMENDED CLASS ACTION COMPLAINT Case No. C 08-01850

1    Plaintiffs Maple and Jerry Lyons (collectively, "Plaintiffs"), by and through their

2  attorneys, bring this action on behalf of themselves and all other similarly situated California

3  homeowners against Defendant First American Title Insurance Company, Inc. ("First American"

4  or "Defendant") seeking redress for Defendant's racially discriminatory residential title

5  insurance pricing practices under California's Fair Employment and Housing Act ("FEHA"),

6  California Government Code § 12900 *et seq.*, and Business and Professions Code § 17200 *et seq.*

7  ("UCL").  Upon information and belief, as well as the investigation of counsel, Plaintiffs allege

8  as follows:

9    **INTRODUCTION**

10    1.    This class action seeks relief for Defendant's racially discriminatory residential

11  title insurance sales practices.

12    2.    As explained further below, Defendant in recent years charged Californians who

13  refinanced their homes with "non-prime" mortgage loans greater amounts for lender's title

14  insurance than Defendant charged those with "prime" mortgage loans.

15    3.    Given that minority homeowners are overwhelmingly concentrated in the "non-

16  prime" segment of California's mortgage market, this practice predictably caused Defendant's

17  refinancing minority customers to pay disparately more in the aggregate for title insurance than

18  comparably situated non-minority Caucasian customers.  Defendant thus unlawfully

19  discriminated against Plaintiffs and the Class on the basis of their race, national origin and/or

20  ancestry, in violation of California law.

21    4.    The discriminatory practices Plaintiffs and the Class challenge with this suit were

22  not necessary to the operation of Defendant's business and did not effectively carry out any

23  significant business need of Defendant's.  In fact, upon information and belief, Defendant in

24  2007 suspended the discriminatory practices in question.  At all material times, feasible

25  alternatives to Defendant's discriminatory practices existed that would have served Defendant's

26  legitimate business purposes (if any) with no less efficacy yet with less discriminatory effects.

27  ///

28  ///

1

5.     On behalf of themselves and a class of all others similarly situated, Plaintiffs ask the Court to declare unlawful Defendant's discriminatory housing practices and award damages and other relief to Plaintiffs and the Class for Defendant's wrongful acts.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction under Code of Civil Procedure § 410.10.

7.     Venue is proper in the County of Contra Costa because Plaintiffs' causes of action accrued in the County of Contra Costa, and Plaintiffs reside in this County.

8.     Venue is also proper in this County under Civil Code § 1780(c) because Defendant is doing business in this County, a substantial number of Defendant's title insurance sales, including Plaintiffs', occurred in this County, and Plaintiffs reside in this County.

## PARTIES

9.     Plaintiffs Maple and Jerry Lyons are African-American homeowners who reside in the City of Richmond, Contra Costa County, California. They reside at the property that is the subject of the title insurance policy at issue in this lawsuit.

10.     Defendant First American Title Insurance Company, Inc. is a California corporation with its principal place of business in Santa Ana, California. Defendant is authorized to do business in the State of California and other states and maintains numerous branches and authorized agents throughout California and other states.

11.     Defendants DOES 1 through 50 are persons or entities whose true names and identities are presently unknown to Plaintiffs, and who therefore are sued by such fictitious names. Plaintiffs are informed and believe and thereon allege that each of the fictitiously named Defendants perpetrated some or all of the wrongful acts alleged herein below, are responsible in some manner for the matters alleged herein, and are jointly and severally liable for the acts complained of herein. Plaintiffs will seek leave of court to amend this complaint to state the true names and capacities of such fictitiously named Defendants when ascertained.

///

///

///

2

1    12.    At all times mentioned herein, each Defendant was the agent or employee of each

2  of the other Defendants and was acting within the course and scope of such agency or

3  employment.  The Defendants are jointly and severally liable to Plaintiffs, to all others similarly

4  situated, and to the general public.

5  **NATURE OF ACTION**

6    13.    This class action challenges Defendant's racially discriminatory sale of lender's

7  policies of residential title insurance in California.

8    14.    Title insurance is indemnity insurance against financial loss from defects in title

9  to real property and from the invalidity or unenforceability of mortgage liens. Lender's title

10  insurance, the subject of this complaint, protects a lender's financial interest in real property

11  against loss due to title defects, liens or other matters.

12    15.    Title insurance is an unavoidable cost of any residential refinancing transaction.

13  Lenders – who are the beneficiaries of the title policies at issue here even though homeowners

14  pay for them – generally require that title insurance be purchased in order to protect their

15  collateral if a title challenge arises.  Without so-called lender's title insurance, lenders generally

16  will not provide a loan to finance or refinance a residential mortgage.

17    16.    California law requires that every title insurer file a rate schedule with the

18  California State Insurance Commissioner. *See* Cal. Ins. Code § 12401.1. Defendant has filed a

19  rate schedule entitled "First American Title Insurance Company; Residential Schedule of Fees"

20  (the "Rate Manual") with the California Department of Insurance that, upon information and

21  belief, was in effect at all times throughout the proposed class period.  Plaintiffs take no position

22  concerning the reasonableness of that rate filing and do not challenge it here.  Rather, Plaintiffs

23  bring this action to recover damages caused by Defendant's discriminatory application of certain

24  discounts established in its Rate Manual.

25    17.    Few know that title insurers such as Defendant generally price title policies

26  according to a multi-tiered pricing structure.  The so-called "basic insurance rate" is, as its name

27  implies, the cornerstone of that pricing structure.  Title insurers express their basic insurance rate

28  in terms of premium dollar amount per unit of insurance coverage and use it (in one way or

3

1  another) to calculate the price for each title insurance policy they sell. In California, Defendant

2  calls its basic insurance rate the "Statewide Basic Insurance Rate; 'A'" (hereinafter referred to as

3  the "Basic Insurance Rate"). Under the terms of Defendant's Rate Manual, California

4  homeowners who purchase title insurance to cover their lenders in connection with home

5  refinancings are entitled to a significant discount on the Basic Insurance Rate as compared to the

6  rate charged for purchase financing. This discount goes by various names, but is most frequently

7  referenced as the "Refinance Rate."

8      18.     Across the title insurance industry, Refinance Rates are significantly lower than

9  Basic Insurance Rates because a title insurer performs less work when preparing a refinance title

10  insurance policy than it does when preparing title insurance policies covering lenders who

11  finance initial home purchases. Refinance transactions generally occur when there has been no

12  change in ownership of a property and a short period of time has elapsed between the purchase

13  of the original title insurance policy and the refinance transaction. Refinance policies only insure

14  policyholders for title-related claims that arise during the time in between placement of the

15  policyholder's original policy and the refinance policy. As a result, title insurers typically rely on

16  the comprehensive title search conducted at the placement of the original policy – and thus spend

17  considerably less time and money conducting an updated title search for placement of a refinance

18  policy.

19      19.     Title insurers, including Defendant, have overcharged refinancing homeowners in

20  California and elsewhere for title insurance by selectively applying these Refinance Rate

21  discounts. The Executive Vice President of the title insurance industry's trade association, the

22  American Land Title Association ("ALTA"), has acknowledged publicly that "[w]e know not

23  everyone is familiar" with refinance rate discounts and that "[w]e know [overcharging] is a

24  problem." (Kenneth R. Harney, "Refinancers Should Seek Lower Rate on Title Insurance," The

25  Baltimore Sun, April 13, 2003, p. 1L.) Yet leaders of the title insurance industry, including

26  Defendant, continue to engage in such deceptive and self-serving pricing as a matter of routine

27  business practice.

28  ///

4

1    20.    As used in this Complaint, "minority" or "minorities" shall refer to all non-

2  Caucasians and other minority racial groups who are protected under the FEHA, California

3  Government Code § 12900 *et seq.*  As discussed further below, minority homeowners such as

4  Plaintiffs are dramatically concentrated in the "non-prime" mortgage lending market that

5  Defendant singles out for increased premiums.

**DEFENDANT'S SELECTIVE APPLICATION**
**OF ITS TITLE INSURANCE DISCOUNTS**

8    21.    Defendant's Rate Manual includes two distinct refinance-related discount

9  provisions that may apply to refinancing homeowners in California: (1) Section C-13(a) provides

10  a substantial discount that can entail more than a 50% reduction from the Basic Insurance Rate;

11  and (2) Section C-13(b) provides a 30% discount from the Basic Insurance Rate.

12    22.    Defendant has engaged in disparate impact racial discrimination by

13  disproportionately denying the more substantial Refinance Rate discount in Section C-13(a) of

14  its Rate Manual to minority borrowers refinancing their homes.  In accordance with the Rate

15  Manual and as a matter of explicit company policy, Defendant denies the more generous of its

16  Refinance Rate discounts (the one appearing in Section C-13(a)) to refinancing homeowners in

17  cases where Defendant or its agents considers the homeowner's underlying financing to be "non-

18  prime."  To wit, Defendant's Rate Manual states that the Refinance Rate discount "does not

19  apply to non-prime loans[.]"  The Rate Manual neither defines the term "non-prime" nor states

20  what criteria will or may be used to classify a loan as "non-prime" for purposes of determining

21  the premium to be charged.

22    23.    A wealth of market data – data that is exceedingly well-known throughout the

23  mortgage industry – demonstrates a strong correlation between non-prime mortgage financing

24  and homeowner race and ethnicity.  This data indicates that minorities receive non-prime

25  mortgage financing far more often than do non-minority Caucasians with similar credit and risk

26  characteristics.  In light of this data, Defendant knew or should have known that its policy of

27  denying its full Refinance Rate discount to "non-prime" borrowers would disparately impact

28  minorities purchasing lender's title insurance from Defendant when refinancing their homes –

5

1    causing them to pay disparately more in the aggregate for the same First American title insurance

2    products purchased by similarly situated non-minority Caucasian customers of First American.

3        24.    This market data has long been well-known to Defendant and others in the

4    mortgage industry.  Nonetheless, Defendant – armed with such knowledge – elected to develop

5    and implement a title insurance sales policy directly based on the mortgage lending practices that

6    produced these striking disparities.

7        25.    Defendant during the recent housing boom priced lenders' refinance title

8    insurance policies with reference not just to the size of the underlying mortgage loan (a common

9    industry pricing practice and arguably a race-neutral method of title insurance pricing), but with

10   reference to Defendant's opinion of the *quality* of the financing associated with that loan (a

11   practice that, upon information and belief, is not employed by any other major American title

12   insurer).  And, as discussed above, all too frequently the "non-prime" quality of a particular

13   homeowner's mortgage financing is closely correlated with his or her race.

14       26.    In short, by routinely and systematically charging "non-prime" refinancing

15   homeowners more for lender's title insurance than other homeowners, Defendant in violation of

16   California law has caused its minority title insurance purchasers to pay disparately excessive title

17   insurance premiums without any business necessity for doing so.

18   ## DEFENDANT FIRST AMERICAN'S TITLE INSURANCE
     ## PRICING PRACTICES DISPARATELY IMPACT HOMEOWNERS
19

20       27.    Defendant discriminates both by itself and through a network of licensed and

21   authorized title insurance agencies and agents.  Authorized title insurance agents and agencies

22   act as Defendant's agents in originating title insurance policies.  Authorized title insurance

23   agents and agencies agree with Defendant to originate title insurance policies in accordance with

24   Defendant's Rate Manual and to adhere to Defendant's policies and procedures with respect to

25   pricing title insurance premiums.

26   ///

27   ///

28   ///

FIRST AMENDED CLASS ACTION COMPLAINT Case No. C 08-01850

28.     Defendant and its authorized title insurance agents and agencies designed, implemented, and adhered to title insurance pricing practices that caused minority homeowners in California to purchase title insurance with excessive premiums and higher rates than similarly situated non-minority homeowners.  This pattern of discrimination is not the result of random or non-discriminatory factors.  Rather, it is a direct result of Defendant's business practices.

29.     Defendant implements its discriminatory title insurance pricing policy in a number of ways, including actively educating its licensed title insurance agents and brokers about Defendant's title insurance policies and procedures and systematically denying title insurance refinance discounts to minority homeowners, who are disproportionately numbered among those with "non-prime" mortgage loans.

30.     Further, while Defendant's use of a common pricing system for the title insurance policies it sells might appear to be racially neutral, Defendant's denial of its full Refinance Rate discount to "non-prime" homeowners inherently is non-neutral in the way it predictably and adversely affects minority homeowners (relative to similarly situated non-minorities).  Minority homeowners are vastly more likely than similarly situated non-minorities to have "non-prime" home mortgage financing.  In denying its most generous lender's title insurance discount to "non-prime" homeowners, without requiring any further objective evaluation of their risk profiles, Defendant virtually ensures that its minority customers will pay disparately greater title insurance premiums than similarly situated non-minority customers pay and thereby suffer discriminatory effects from Defendant's title insurance sales practices.

31.     The practices complained of herein were not necessary to the operation of Defendant's business and did not effectively fulfill any significant business need.  What type of loan a refinancing lender supplies to a homeowner is not a valid or statistically sound predictor of the title insurance risk that particular homeowner poses, and its use by Defendant as a price-setting factor is inexcusable given the well-known correlation between non-prime mortgage financing and race in American mortgage lending and the discriminatory effects of Defendant's practices on Plaintiffs and the Class.  At all times material hereto, feasible alternatives to

7

1   Defendant's discriminatory practices existed that would have equally well or better

2   accomplished Defendant's business purposes with less discriminatory effects.

3         32.   Interestingly, materials concerning title insurance claims developed by the title

4   insurance industry's trade association, the American Land Title Association ("ALTA"), indicate

5   that homeowner loan quality is not a recognized title insurance risk. Defendant is a member of

6   ALTA.

7         33.   Posted on ALTA's Internet site are materials relating to ALTA title insurance

8   "risk codes." As ALTA puts it, "ALTA has developed various risk codes to allow title

9   companies and underwriters to inventory and understand their claims experience, as well as

10  identify trends and problem areas for loss prevention and training purposes."

11  (http://www.alta.org/standards/risk.cfm (last viewed June 10, 2008).) ALTA's risk codes catalog

12  the "Basic Risks" and "Special Risks" its member title insurers (including Defendant) face on

13  incoming title insurance claims. Notably, "non-prime" or "sub-prime" lending is not included

14  among these major title insurance risks.

15        34.   Title insurance industry claims patterns explain why that is so. The leading

16  insurance industry rating firm A.M. Best Company ("Best") notes that, "title insurance

17  [companies] experience[] a high frequency of low-dollar claims, occasionally generating a severe

18  claim," that title insurance is a "relatively low risk" business and that the "bulk of title insurance

19  claims occur shortly after closing and represent low-dollar costs." (http://www.alta.org/

20  indynews/Research/SR1101title.pdf (last viewed June 10, 2008).) For that reason, the

21  Bloomberg financial news service recently reported that, even though many of America's "non-

22  prime" borrowers today are in default on their loans (and were in 2007), Defendant and other

23  major title insurers paid out less than 20% of their revenues in claims in 2007 "because title

24  insurance claims aren't directly linked to slumping prices or whether mortgages get paid on

25  time." (http://www.bloomberg.com/apps/news?pid=20601203&sid=asmjmzy64wLg&refer

26  =insurance (last viewed June 10, 2008).)

27  ///

28  ///

8

## DEFENDANT FIRST AMERICAN IMPOSED EXCESSIVE
## AND DISCRIMINATORY PREMIUM CHARGES ON PLAINTIFFS

35.     Defendant's discriminatory title insurance pricing policy directly damaged Plaintiffs.

36.     On or about August 23, 2005, Plaintiffs refinanced the existing mortgage on their home in Richmond, California.  Plaintiffs' lender in their August 23, 2005, refinancing was Countrywide Home Loans, Inc. ("Countrywide").

37.     The HUD-I Settlement Statement for Plaintiffs' August 23, 2005, refinancing reflects that Plaintiffs paid off a prior Countrywide loan when they refinanced with Countrywide on August 23, 2005.  Upon information and belief, Lenders Choice Title Company ("Lender's Choice") supplied title insurance in connection with Plaintiffs' August 23, 2005, refinancing.  Upon information and belief, Lender's Choice is an authorized agent for Defendant and conveyed a title insurance policy that was paid for by Plaintiffs and issued and underwritten by Defendant in connection with Plaintiffs' August 23, 2005 home refinancing.

38.     Plaintiffs borrowed $387,200.00 from Countrywide in connection with their August 23, 2005, refinance transaction, and the lender's title insurance policy they purchased from Defendant covered Countrywide up to the amount of their (then-) new mortgage, $387,200.

39.     Plaintiffs' HUD-I Settlement Statement indicates that in connection with their refinancing transaction, Plaintiffs paid a premium of $939.00 for the purchase of lender's title insurance coverage from Defendant.

40.     Defendant did not provide Plaintiffs with a copy of its Rate Manual or with any other information explaining how the amount of the premium was calculated.

41.     Upon information and belief, in calculating Plaintiffs' title insurance premium, Defendant (itself or through its agent) determined that Countrywide's terms for providing credit to Plaintiffs in the underlying refinance transaction were "non-prime" and accordingly sold Plaintiffs title insurance without affording them the full Refinance Rate discount set out in Section C-13(a) of Defendant's Rate Manual.  Had Defendant given Plaintiffs the full

9

1   refinancing premium discount set forth in its Rate Manual, Plaintiffs would have been charged
2   only $550.00 for their policy.

3       42.    Plaintiffs were damaged by the above-described conduct.

4       43.    There is no adequate or appropriate administrative remedy available to Plaintiffs
5   for redressing the claims asserted herein.  Pursuant to the Order of this Court entered January 12,
6   2009 and Insurance Code § 12414.13, on February 17, 2009 Plaintiffs presented the California
7   Insurance Commissioner with detailed information about their claims and requested the
8   Commissioner to either commence a hearing and investigation, or to issue an order declining to
9   exercise jurisdiction over this matter.  On April 22, 2009, the Department of Insurance sent a
10  letter to Plaintiffs' counsel concluding that its jurisdiction in this case is primary rather than
11  exclusive, and that, "[a]fter a careful review of the circumstances in this case and the materials
12  submitted by the parties, the Commissioner has decided not to exercise jurisdiction in this
13  matter."  A true and correct copy of that letter is attached hereto as Exhibit A.

14  **CLASS ACTION ALLEGATIONS**

15      44.    Plaintiffs bring this class action pursuant to California law on behalf of
16  themselves and all minority customers of Defendant (the "Class") (hereinafter collectively
17  referred to as the "Class" or "members of the Class") in California who: (1) have purchased
18  lender's title insurance policies from Defendant (2) in connection with the refinancing of their
19  homes (3) during the period Defendant's California Rate Manual featuring the §C-13(a) and (b)
20  discounts was in effect ("Class Period"), and (4) to whom Defendant denied the full Refinance
21  Rate discount based on their underlying "non-prime" mortgage financing.  Plaintiffs and
22  members of the Class have thus been subjected to disparate impact racial discrimination and
23  unlawful business practices, in violation of California law.

24      45.    Plaintiffs do not know the exact size of the Class or identities of the members of
25  the Class, since that information is in the exclusive control of Defendant. Plaintiffs believe that
26  the Class includes many thousands, or tens of thousands of individuals, who are geographically
27  dispersed throughout California. Therefore, the Class is so numerous that joinder of all members
28  is impracticable.

10

46.     All members of the Class have been subjected to and affected by Defendant's practice of denying its full § C-13(a) Refinance Rate discount to borrowers deemed by Defendant and its agents to have "non-prime" loans in their underlying refinance transactions. There are questions of law and fact that are common to the Class, and that predominate over any questions affecting only individual members of the Class.  These questions include, but are not limited to the following:

a.  ·     the nature and scope of Defendant's policies and procedures concerning the calculation of title insurance premiums and all applicable refinance discounts available to title insurance applicants engaged in refinance transactions;

b.     whether Defendant denied Class Members the full benefit of its Refinance Rate discount and thereby unlawfully discriminated against the Class;

c.     whether Defendant discriminated against Class Members by denying the full Refinance Rate discount to homeowners whose underlying financing terms could reasonably be interpreted or evaluated as "prime" in character;

d.     whether Defendant's title insurance pricing policies and procedures had a discriminatory impact on minorities;

e.     whether Defendant's discriminatory practices were necessary to the operation of its business and effectively carried out a significant business need or needs of Defendant;

f.     whether Defendant's title insurance pricing policies and procedures concerning denial of the full Refinance Rate discount to homeowners with "non-prime" financing in refinance transactions have a disparate impact on minority homeowners;

g.     whether Defendant's conduct in charging excessive title insurance premiums to minority homeowners in California refinancing their homes violated the California Fair Employment and Housing Act, California Government Code §12955(i);

h.     whether Defendant's conduct in charging excessive title insurance premiums to minority homeowners in California violated California Business and

1    Professions Code §17200 because it was unlawful in that it violated California Insurance

2    Code §679.1 and/or the FEHA;

3         i.    whether there are feasible alternatives to Defendant's discriminatory

4    practices that would equally well or better accomplish the business purpose (if any) of

5    Defendant's challenged practices with a less discriminatory effect;

6         j.    whether the Court can award damages and restitution to Plaintiffs and the

7    Class; and

8         k.    the proper measure of relief to Plaintiffs and the Class.

9    47.    Plaintiffs' claims are typical of the claims of the Class, and do not conflict with

10   the interests of any other members of the Class in that both Plaintiffs, and the other members of

11   the Class, were subjected to the same acts of discrimination by Defendant.

12   48.    Plaintiffs will fairly and adequately represent the interests of the Class. Plaintiffs

13   are committed to vigorous prosecution of the Class's claims, and they have retained attorneys

14   who have extensive experience in consumer protection actions, discrimination actions and class

15   actions.

16   49.    Defendant has acted or refused to act on grounds generally applicable to the

17   Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with

18   respect to the class as a whole.

19   50.    A class action is superior to other methods for the speedy and efficient

20   adjudication of this controversy.  A class action regarding the issues in this case does not create

21   any problems of manageability.

22   **ACCRUAL, CONTINUING VIOLATION AND EQUITABLE TOLLING**

23   51.    Plaintiffs and Class Members did not know, and could not reasonably have

24   known, that they would receive from Defendant title insurance policies with inflated premiums

25   and discriminatory terms.  Their claims did not accrue until shortly before the filing of this

26   action.

27   ///

28   ///

52.     Defendant's discriminatory conduct was inherently self-concealing because, among other things: (a) Defendant did not inform Plaintiffs how it determined the premium charged for the lenders' title insurance policy they purchased; (b) Defendant did not provide Plaintiffs with the Rate Manual or any other information from which they could have determined how the premiums were calculated; (c) the Rate Manual does not explain how Defendant decides whether a loan is or is not "non-prime;" and (d) the complex provisions of the Rate Manual are well beyond the understanding of ordinary consumers such as the Plaintiffs. Defendant knew that Plaintiffs and Class Members could not independently determine whether their subject loan financing was or would be deemed "non-prime" by Defendant.

53.     Although well-known to Defendant, the fact that there is a high correlation between a homeowner's race and the quality of the loan the homeowner receives was not known to or reasonably discoverable by the Plaintiffs or Class Members. At the time they refinanced their home, Plaintiffs had no reasonable ability independently to determine whether their title insurance coverage was priced in a discriminatory way relative to that supplied to other refinancing homeowners with similar risk characteristics.

54.     As a result of the foregoing, Plaintiffs and Class Members in the exercise of due diligence could not have reasonably discovered the discriminatory practices at the time they refinanced their homes. Plaintiffs did not discover this information until in or about March, 2008, when they began having problems paying their mortgage and consulted with financial consultants and attorneys. For the reasons alleged above, the un-named members of the Class still do not know that they have been and continue to be injured by Defendant's discriminatory conduct.

55.     Defendant's discriminatory conduct is continuing in nature, and Defendant has committed discriminatory acts throughout the limitations period. Class members who bought title insurance from Defendant during the applicable period of limitations continue to be harmed by the excessive and discriminatory title insurance premiums Defendant charged them. Plaintiffs in particular continue to be harmed by Defendant's discriminatory overcharging. As Plaintiffs' HUD-I closing statement reflects, Plaintiffs fully financed their excessive and discriminatory title

1    insurance premium payment to Defendant with part of the proceeds of their August 2005

2    refinance loan from Countrywide. Plaintiffs, in other words, borrowed money from

3    Countrywide (in part) in order to pay Defendant the title insurance premium that is the subject of

4    this lawsuit. Plaintiffs remain mortgagors on said Countrywide mortgage loan today – and

5    Defendant's wrongful acts thus continue to harm Plaintiffs, since each month they pay

6    wrongfully inflated interest on their loan as a result of Defendant's discrimination.

7         56.    There is a substantial nexus between the acts of discrimination occurring within

8    the limitation periods prior to filing suit, and the acts of discrimination before that time. The acts

9    involve the same type of discrimination and are recurring, not isolated, events.

10        57.    Furthermore, Defendant may not invoke any otherwise applicable statutes of

11   limitations because Plaintiffs and members of the Class have been prevented from timely

12   pursuing their claims by sufficiently inequitable circumstances, and any delay on the part of

13   Plaintiffs and the Class in pursuing relief is therefore excusable.

14        58.    The statutes of limitations applicable to any claims that Plaintiffs or other Class

15   Members have brought or could bring as a result of the unlawful and fraudulent concealment and

16   course of conduct described herein, have been tolled as a result of Defendant's fraudulent

17   concealment. In addition, Plaintiffs and the Class did not discover and could not have

18   discovered their causes of action until the time alleged below, thereby tolling any applicable

19   statute of limitations.

20                              **COUNT I**

21                  **VIOLATION OF CALIFORNIA FAIR EMPLOYMENT**

22   **AND HOUSING ACT, CALIFORNIA GOVERNMENT CODE §12900, _et. seq._**

23        59.    Plaintiffs repeat, re-allege and incorporate the allegations in paragraphs 1 through

24   58 above as if fully set forth herein.

25   ///

26   ///

27   ///

28   ///

                                    14

60.     The sale of residential lender's title insurance is a "real estate-related transaction" within the meaning of the FEHA.  Cal. Gov. Code §12927(h)(1).  Plaintiffs' home refinancing and their purchase of title insurance from Defendant was such a residential real estate-related transaction.  Defendant is a "business establishment" within the meaning of the FEHA.  Cal. Gov. Code §12955.8(b)(2).

61.     Plaintiffs are African-American residents of California, and are protected on account of their race by California law, including Section 51 of the California Civil Code and FEHA.

62.     The FEHA prohibits discrimination on account of "race, color, religion, sex, sexual orientation, marital status, national origin, ancestry, familial status, source of income, and disability." Cal. Gov. Code §§12920, 12955.

63.     It is unlawful under FEHA to discriminate on account of the above-described characteristics against any person in making available a real estate related transaction or in the terms and conditions of such transaction. Cal. Gov. Code §12955(i).

64.     Defendant by virtue of transacting substantial business in this County and throughout the State of California is subject to the provisions of Cal. Civ. Code §51.  FEHA also prohibits anyone subject to the provisions of Cal. Civ. Code §51 from discriminating against "any person on the basis of sex, sexual orientation, color, race, religion, ancestry, national origin, familial status, marital status, disability, source of income, or on any other basis prohibited by that section." Cal. Gov. Code §12955(d).

65.     Under Cal. Gov. Code §12955, the definition of the terms "race, color, religion, sex, sexual orientation, marital status, national origin, ancestry, familial status, source of income, and disability" includes a perception that the person has or possesses any of those characteristics or that the person is associated with a person who has, or is perceived to have, any of those characteristics.  Cal. Gov. Code §12955(m).

66.     Further, discrimination as defined by FEHA, includes and prohibits the "provision of inferior terms, conditions, privileges, facilities, or services in connection with [those] housing accommodations."  Cal.Gov. Code §12927(c)(1).

15

67.     Defendant has violated all of these prohibitions with respect to Plaintiffs and the Class by charging minority homeowners with "non-prime" refinancing disparately high amounts for lender's title insurance relative to what Defendant charged non-minority Caucasian title insurance purchasers. Defendant has discriminated against Plaintiffs and members of the Class concerning their ability to participate in real estate-related transactions and in the terms and conditions of such transactions, in violation of the FBHA. Cal. Gov. Code §12955(i)

68.     Cal. Gov. Code §12955.8(b) permits injured parties to pursue claims for housing discrimination under the disparate impact theory of liability. Defendant's title insurance pricing policies and procedures – specifically, Defendant's denial of the full Refinance Rate reduction in premium for lender's title insurance policies purchased by "non-prime" homeowners – had a discriminatory disparate impact upon Plaintiffs and Class Members.

69.     As a proximate result of Defendant's violation of Cal. Gov. Code §§12920 and 12955, Plaintiffs and members of the Class have been directly and proximately injured and are entitled to damages in an amount to be proven at trial.

70.     Plaintiffs and members of the Class ask this Court to declare the rights of the parties herein regarding Defendant's obligation to provide title insurance without discriminating against homeowners on account of their race, and to award Plaintiffs and the Class damages and other relief as prayed for below.

## COUNT II

## VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE SECTION 17200, *et seq.*

71.     Plaintiffs hereby incorporate by reference each and every allegation contained in paragraphs 1 through 70 of this Complaint as if fully rewritten herein.

72.     In selling its title insurance products to Plaintiffs and members of the Class as described above, Defendant and its authorized agents engaged in unlawful business acts within the meaning of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.* Defendant's failure to deal lawfully with Plaintiffs and the Class Members is part of a regular business practice that violates the UCL.

16

73.     Defendant violated the UCL's prohibition against engaging in unlawful business practices by discriminating against minority title insurance applicants as described herein and thereby violating both California Insurance Code §679.71 and the FEHA, as described above.

74.     California Insurance Code § 679.71 prohibits insurers in California from issuing policies "under conditions less favorable to the insured than in other comparable cases, except for reasons applicable alike to persons of every marital status, sex, race, color, religion, national origin, or ancestry." It applies to "policies of insurance" that insure against "[l]oss of or damage to real property which is used primarily for residential purposes" and against "[l]egal liability of a natural person or persons for loss of, damage to, or injury to, persons or property." California Insurance Code § 679.70(a), (c). Plaintiffs and the Class are "insureds" within the meaning of those provisions, and the title insurance policy they purchased from Defendant was a policy of insurance insuring against "[l]oss of or damage to real property which is used primarily for residential purposes" and/or "[l]egal liability of a natural person or persons for loss of, damage to, or injury to, persons or property."

75.     Upon information and belief, Defendant issued title insurance policies to Plaintiffs and the Class under conditions that were less favorable to Plaintiffs and the Class than they were to non-minority homeowners in comparable cases for a particular "reason" – presumably, perceived greater title insurance risks associated with the fact of Plaintiffs' "non-prime" refinancing credit. Given the critical mass of well-known industry data closely correlating homeowner "non-prime" refinancing loan quality and homeowner race, that "reason" is not "applicable alike to persons of every marital status, sex, race, color, religion, national origin, or ancestry."

76.     Defendant's title insurance sales practices thus violated California Insurance Code §679.71, the FEHA and the UCL. Plaintiffs and the Class proximately and directly suffered an ascertainable loss as a result of these violations in an amount to be proved at trial.

///

///

///

FIRST AMENDED CLASS ACTION COMPLAINT Case No. C 08-01850

## PRAYER FOR RELIEF

WHEREFORE PREMISES CONSIDERED, Plaintiffs request the following relief:

1.   An order determining that this action is a proper class action;

2.   A judgment awarding Plaintiffs and Class Members compensatory damages according to proof;

3.   A judgment granting Plaintiffs and Class Members restitution for their losses;

4.   An order finding and declaring that Defendant's acts and practices as challenged herein are unlawful;

5.   A judgment awarding Plaintiffs and Class Members costs and disbursements incurred in connection with this action, including reasonable attorneys' fees, costs and expenses; and

6.   A judgment or other order granting such other and further relief as the Court deems just and proper.

DATED:  June 24, 2009

CHAVEZ & GERTLER LLP

SCNEIDER WALLACE COTTRELL
 BRAYTON KONECKY LLP

BONNETT, FAIRBOURN, FRIEDMAN
 & BALINT PC

By: _Nance Becker_ _____
     Nance F. Becker

Attorneys for Plaintiffs
MAPLE LYONS and JERRY LYONS

18

1

<u>JURY DEMAND</u>

2           Plaintiffs hereby demand a trial by jury of the maximum number allowed by law.

3

4   DATED:  June 24, 2009                  CHAVEZ & GERTLER LLP

5                              SCNEIDER WALLACE COTTRELL
                              BRAYTON KONECKY LLP

6

7                              BONNETT, FAIRBOURN, FRIEDMAN &
                              BALINT PC

8

By: _Nance Becker_

9                              Nance F. Becker

10                           Attorneys for Plaintiffs

11                           MAPLE LYONS and JERRY LYONS

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED CLASS ACTION COMPLAINT Case No. C 08-01850

# EXHIBIT A

STATE OF CALIFORNIA

Steve Poizner, *Insurance Commissioner*

## DEPARTMENT OF INSURANCE
Legal Division, Office of the Commissioner
45 Fremont Street, 23rd Floor
San Francisco, CA 94105

Adam M. Cole
General Counsel
TEL: 415-538-4010
FAX: 415-904-5889
E-Mail: colea@insurance.ca.gov
www.insurance.ca.gov

RECEIVED
APR 2 3 2009



April 22, 2009

Nance F. Becker, Esq.
Chavez & Gertler LLP
42 Miller Avenue
Mill Valley, CA 94941

Joel D. Siegel, Esq.
Sonnenschein Nath & Rosenthal LLP
601 South Figueroa Street, Suite 2500
Los Angeles, CA 90017-5704

SUBJECT:   *Lyons v. First American Title Insurance Company*
           Contra Costa Superior Court Case No. C08-01850

Dear Counsel:

The Commissioner and his staff have reviewed the letters and attachments submitted by both parties, including Judge Craddick's order of January 12, 2009. After a careful review of the circumstances in this case and the materials submitted by the parties, the Commissioner has decided not to exercise jurisdiction in this matter.

The Commissioner's jurisdiction in this case is primary, rather than exclusive. (See, e.g., *Farmers Insurance Exchange v. Superior Court* (1992) 2 Cal.4th 377, 390.) The primary jurisdiction doctrine is one grounded in discretion and permits an agency to accept or decline jurisdiction if the agency so chooses. (*Wise v. Pacific Gas & Electric Co.* (2005) 132 Cal.App.4th 725, 733.)

Because the allegations raised in this complaint do not call upon the specialized expertise of this agency, the Commissioner respectfully declines to accept jurisdiction of *Lyons v. First American Title Insurance Company.* At your earliest convenience, please notify Contra Costa County Superior Court Judge Craddick of the Commissioner's decision.

Very truly yours,

Adam M. Cole
General Counsel

Consumer Hotline (800) 927-HELP • Producer Licensing (800) 967-9331

EXHIBIT A

1

**PROOF OF SERVICE – VIA EMAIL AND MAIL**
(C.C.P. §1013a(3))

2

3    STATE OF CALIFORNIA    )
                            ) ss.
4    COUNTY OF MARIN        )

5        I am employed in the County of Marin, State of California.  I am over the age of 18 years
     and not a party to the within action; my business address is Chavez & Gertler LLP, 42 Miller
6    Avenue, Mill Valley, CA 94941.

7        On June 24, 2009, I served the foregoing documents:

8    • **FIRST AMENDED COMPLAINT**

9

10   on the interested parties in this action by placing a true copy thereof enclosed in a sealed
     envelope addressed to each as follows:

11

12   Joel D. Siegel, Esq.                          Charles A. Newman, Esq.
     Sonnenschein Nath & Rosenthal LLP            Sonnenschein Nath & Rosenthal LLP
     601 South Figueroa Street, Suite 2500         One Metropolitan Square, Suite 3000
13   Los Angeles, CA  90017                        St. Louis, MO  63102

14   Jason E. Maschmann, Esq.
     Sonnenschein Nath & Rosenthal LLP
15   One Metropolitan Square, Suite 3000
16   St. Louis, MO  63102

17

18   [X]    **BY MAIL:**  I am readily familiar with the business' practice for collection and
     processing of correspondence for mailing with the United States Postal Service.  I know that the
19   correspondence is deposited with the United States Postal Service on the same day this
     declaration was executed in the ordinary course of business.  I know that the envelope was sealed
     and, with postage thereon fully prepaid, placed for collection and mailing on this date, following
20   ordinary business practices, in the United States mail at Mill Valley, California.

21       Executed on June 24, 2009, at Mill Valley, California.

22       I declare under penalty of perjury under the laws of the State of California that the above
     is true and correct.  I declare that I am employed in the office of a member of the bar of this court
23   at whose direction the service was made.

24

25                                              _Cate Coelho_
26                                              _____
                                                Cate L. Coelho
27

28

                                                                          PROOF OF SERVICE

Exhibit C



1  Mark A. Chavez (SBN 90858)
   Nance F. Becker (SBN 99292)
2  CHAVEZ & GERTLER LLP
   42 Miller Ave.
3  Mill Valley, CA 94941
   Telephone: (415) 381-5599
4  Facsimile: (415) 381-5572

   Attorneys for Plaintiffs
   Maple and Jerry Lyons
6

7  Charles A. Newman (*Pro Hac Vice*)
   Jason E. Maschmann (*Pro Hac Vice*
8  SONNENSCHEIN NATH & ROSENTHAL LLP
   One Metropolitan Square
9  211 North Broadway, Suite 3000
   St. Louis, Missouri 63102
10 Telephone: (314) 241-1800
   Facsimile: (314) 259-5959
11

12 Attorneys for Defendant First American
   Title Insurance Company
13

14 *Additional Counsel Listed on Attached Page*

15

16

17              SUPERIOR COURT OF THE STATE OF CALIFORNIA

18                  FOR THE COUNTY OF CONTRA COSTA

19

20 MAPLE LYONS and JERRY LYONS,        Case No. C 08-01850
   individually and on behalf of all others
21 similarly situated,                 **STIPULATION AND [PROPOSED]
                                        ORDER GRANTING PLAINTIFFS
22                 Plaintiffs,          LEAVE TO FILE SECOND AMENDED
                                        COMPLAINT**
23        v.
                                        **BY FAX**
24 FIRST AMERICAN TITLE
   INSURANCE COMPANY, a California     Action Filed: July 22, 2008
25 Corporation, and DOES 1 through 50,  Trial Date: Not Assigned
   inclusive,
26
                   Defendants.
27

28
─────────────────────────────────────────────────
   STIPULATION AND [PROPOSED] ORDER RE FILING OF SECOND AMENDED COMPLAINT

RECEIVED SEP 0 1 2009

F I L E D

AUG 2 8 2009



1    WHEREAS, Plaintiffs Maple Lyons and Jerry Lyons, through their counsel, desire to file

2    a Second Amended Complaint in this action, replacing and superseding the First Amended

3    Complaint filed on June 25, 2009;

4    WHEREAS, a copy of the proposed Second Amended Complaint adding a claim for

5    alleged violations of the federal Fair Housing Act, 42 U.S.C. § 3601 et seq. ("FHA") and

6    making other changes to the First Amended Complaint is attached hereto as Exhibit A.

7    WHEREAS, a "redlined" copy of the Second Amended Complaint showing the changes

8    made to the First Amended Complaint is attached hereto as Exhibit B;

9    WHEREAS, Defendant has filed a demurrer to the First Amended Complaint which is

10   now pending and scheduled for hearing on September 8, 2009;

11   NOW, THEREFORE, IT IS HERBY STIPULATED by the parties, through their

12   respective counsel:

13   1.    A Second Amended Complaint in the form of the proposed Second Amended

14   Complaint attached hereto as Exhibit A is deemed filed and served on the date on which the

15   Order accompanying this stipulation is received by counsel for Defendant;

16   2.    Defendant shall have thirty-five (35) days from service of the Second Amended

17   Complaint within which to respond to the Second Amended Complaint, or any part thereof;

18   3.    The pending demurrer to the First Amended Complaint, scheduled for hearing on

19   September 8, 2009, is taken off calendar without prejudice.

20

21   SO STIPULATED:

22   Dated: August **24**, 2009

23                              SCHNEIDER WALLACE COTTRELL
                               BRAYTON KONECKY LLP
24                              CHAVEZ & GERTLER LLP
                               BONNETT FAIRBOURN, FRIEDMAN &
25                              BALINT PC

26

27                              By _____
28                                   NANCE F. BECKER
                                    Attorneys for Plaintiffs
                                    MAPLE AND JERRY LYONS

-1-

STIPULATION AND [PROPOSED] ORDER RE FILING OF SECOND AMENDED COMPLAINT

Dated: August __24__, 2009          SONNENSCHEIN NATH & ROSENTHAL LLP


By _Charles A. Newman_ (un) _signed by agreement_
JOEL. D. SIEGEL
CHARLES A. NEWMAN
Attorneys for Defendant
FIRST AMERICAN TITLE INSURANCE
COMPANY

## ORDER ON STIPULATION

Based upon the foregoing stipulation, and good cause having been found, IT IS

HEREBY ORDERED:

    1.   Plaintiffs are granted leave to file a Second Amended Complaint in the form

attached hereto as Exhibit A;

    2.   The Second Amended Complaint is deemed filed and served on the date of this

Order;

    3.   Defendant shall have thirty-five (35) days from the date of this Order within which

to respond in any manner to the Second Amended Complaint;

    4.   The pending demurrer to the First Amended Complaint currently set for hearing in

this Court on September 8, 2009 is taken off calendar without prejudice.


Dated: August __23__, 2009          By **J. S. CRADDICK**
                                    _____
                                    Honorable Judith Craddick

27330950\V-1

STIPULATION AND [PROPOSED] ORDER RE FILING OF SECOND AMENDED COMPLAINT

1  *Additional Counsel*

2  Mark T. Johnson (SBN 76904)
   SCHNEIDER WALLACE COTTRELL BRAYTON KONECKY LLP
3  180 Montgomery St., Suite 2000
   San Francisco, CA 94104
4  Telephone: 415-421-7100
   Facsimile: 415-421-7105
5
   Andrew Friedman (admitted pro hac vice)
6  BONNETT FAIRBOURN FRIEDMAN & BALINT, PC
   2901 N. Central Avenue, Suite 1000
7  Phoenix, AZ 85012
   Telephone: 602-274-1100
8  Facsimile: 602-274-1199

9  Attorneys for Plaintiffs Maple and Jerry Lyons

10
   Joel D. Siegel (State Bar No. 155581)
11 Leanna M. Anderson (State Bar No. 228271)
   SONNENSCHEIN NATH & ROSENTHAL LLP
12 601 South Figueroa Street, Suite 2500
   Los Angeles, California 90017-5704
13 Telephone: (213) 623-9300
   Facsimile: (213) 623-9924
14
   Attorneys for Defendant First American Title Insurance Company
15

16

17

18

19

20

21

22

23

24

25

26

27

28

-3-

STIPULATION AND [PROPOSED] ORDER RE FILING OF SECOND AMENDED COMPLAINT

Exhibit D

1    CHAVEZ & GERTLER LLP
     MARK A. CHAVEZ (Bar No. 90858)
2    NANCE F. BECKER (Bar No. 99292)
     42 Miller Ave.
3    Mill Valley, CA  94941
     Telephone: (415) 381-5599
4    Facsimile:  (415) 381-5572

5    SCHNEIDER WALLACE COTTRELL BRAYTON KONECKY LLP
     GARRETT WOTKYNS (admitted *pro hac vice*)
6    7702 East Doubletree Ranch Road, Ste. 300
     Scottsdale, AZ 85258
7    Telephone: (480) 607-4368
     Facsimile:  (480) 348-3999
8
     SCHNEIDER WALLACE COTTRELL BRAYTON KONECKY LLP
9    MARK T. JOHNSON (Bar No 76904)
     180 Montgomery St., Ste. 2000
10   San Francisco, CA 94104
     Telephone: (415) 421-7100
11   Facsimile:  (415) 421-7105

12   BONNETT, FAIRBOURN, FRIEDMAN & BALINT, PC
     ANDREW FRIEDMAN (admitted *pro hac vice*)
13   2901 N. Central Avenue, Suite 1000
     Phoenix, AZ 85012
14   Telephone: (602) 274-1100
     Facsimile:  (602) 274-1199
15
     Attorneys for Plaintiffs
16
                    SUPERIOR COURT OF THE STATE OF CALIFORNIA
17
                    COUNTY OF CONTRA COSTA - UNLIMITED JURISDICTION
18

19   MAPLE LYONS and JERRY LYONS,          )   Case No.: C 08-01850
     individually and on behalf of all others )   **CLASS ACTION**
20   similarly situated,                    )
                                            )   **[PROPOSED] SECOND AMENDED**
21              Plaintiffs,                 )   **COMPLAINT FOR VIOLATIONS OF**
                                            )   **FAIR HOUSING ACT, 42 U.S.C. § 3601,**
22        vs.                               )   ***ET. SEQ.*; FAIR EMPLOYMENT AND**
                                            )   **HOUSING ACT, CALIFORNIA**
23   FIRST AMERICAN TITLE INSURANCE         )   **GOVERNMENT CODE § 12900, *ET. SEQ.*;**
     COMPANY, a California Corporation, and )   **AND FOR UNLAWFUL BUSINESS**
24   DOES 1-50, inclusive,                  )   **PRACTICES, CALIFORNIA BUSINESS**
                                            )   **AND PROFESSIONS CODE § 17200, *ET.***
25              Defendants.                 )   ***SEQ.***
                                            )
26                                          )
                                            )   **Dept. 09: Hon. Judith Craddick**
27                                          )
                                            )   **JURY TRIAL DEMANDED**
28                                          )

─────────────────────────────────────────────────────────

1    Plaintiffs Maple and Jerry Lyons (collectively, "Plaintiffs"), by and through their

2  attorneys, bring this action on behalf of themselves and all other similarly situated California

3  homeowners against Defendant First American Title Insurance Company, Inc. ("First American"

4  or "Defendant") seeking redress for Defendant's racially discriminatory residential title

5  insurance pricing practices under the Fair Housing Act, 42 U.S.C. § 3601 *et seq.* ("FHA"),

6  California's Fair Employment and Housing Act ("FEHA"), California Government Code §

7  12900 *et seq.*, and Business and Professions Code § 17200 *et seq.* ("UCL"). Upon information

8  and belief, as well as the investigation of counsel, Plaintiffs allege as follows:

9                              **INTRODUCTION**

10    1.    This class action seeks relief for Defendant's racially discriminatory residential

11  title insurance sales practices.

12    2.    As explained further below, Defendant in recent years charged Californians who

13  refinanced their homes with "non-prime" mortgage loans greater amounts for lender's title

14  insurance than Defendant charged those with "prime" mortgage loans.

15    3.    Given that minority homeowners are overwhelmingly concentrated in the "non-

16  prime" segment of California's mortgage market, this practice predictably caused Defendant's

17  refinancing minority customers to pay disparately more in the aggregate for title insurance than

18  comparably situated non-minority Caucasian customers. Defendant thus unlawfully

19  discriminated against Plaintiffs and the Class on the basis of their race, national origin and/or

20  ancestry, in violation of California and federal law.

21    4.    The discriminatory practices Plaintiffs and the Class challenge with this suit were

22  not necessary to the operation of Defendant's business and did not effectively carry out any

23  significant business need or serve any legitimate business justification of Defendant's. In fact,

24  upon information and belief, Defendant at some time in 2007 suspended the discriminatory

25  practices in question. At all material times, feasible alternatives to Defendant's discriminatory

26  practices existed that would have served Defendant's legitimate business purposes (if any) with

27  no less efficacy yet with less discriminatory effects.

28    5.    On behalf of themselves and a class of all others similarly situated, Plaintiffs ask

                                    1

1  the Court to declare unlawful Defendant's discriminatory housing practices and award damages

2  and other relief to Plaintiffs and the Class for Defendant's wrongful acts.

### JURISDICTION AND VENUE

4    6.    This Court has jurisdiction under Code of Civil Procedure § 410.10.

5    7.    Venue is proper in the County of Contra Costa because Plaintiffs' causes of action

6  accrued in the County of Contra Costa, and Plaintiffs reside in this County.

7    8.    Venue is also proper in this County under Civil Code § 1780(c) because

8  Defendant is doing business in this County, a substantial number of Defendant's title insurance

9  sales, including Plaintiffs', occurred in this County, and Plaintiffs reside in this County.

### PARTIES

11    9.    Plaintiffs Maple and Jerry Lyons are African-American homeowners who reside

12  in the City of Richmond, Contra Costa County, California.  They reside at the property that is the

13  subject of the title insurance policy at issue in this lawsuit.

14    10.    Defendant First American Title Insurance Company, Inc., is a California

15  corporation with its principal place of business in Santa Ana, California.  Defendant is authorized

16  to do business in the State of California and other states and maintains numerous branches and

17  authorized agents throughout California and other states.

18    11.    Defendants DOES 1 through 50 are persons or entities whose true names and

19  identities are presently unknown to Plaintiffs, and who therefore are sued by such fictitious

20  names.  Plaintiffs are informed and believe and thereon allege that each of the fictitiously named

21  Defendants perpetrated some or all of the wrongful acts alleged herein below, are responsible in

22  some manner for the matters alleged herein, and are jointly and severally liable for the acts

23  complained of herein.  Plaintiffs will seek leave of court to amend this complaint to state the true

24  names and capacities of such fictitiously named Defendants when ascertained.

25    12.    At all times mentioned herein, each Defendant was the agent or employee of each

26  of the other Defendants and was acting within the course and scope of such agency or

27  employment.  The Defendants are jointly and severally liable to Plaintiffs, to all others similarly

28  situated, and to the general public.

2

## NATURE OF ACTION

13.     This class action challenges Defendant's racially discriminatory sale of lender's policies of residential title insurance in California.

14.     Title insurance is indemnity insurance against financial loss from defects in title to real property and from the invalidity or unenforceability of mortgage liens. Lender's title insurance, the subject of this complaint, protects a lender's financial interest in real property against loss due to title defects, liens or other matters.

15.     Title insurance is an unavoidable cost of any residential refinancing transaction. Lenders – who are the beneficiaries of the title policies at issue here even though homeowners pay for them – generally require that title insurance be purchased in order to protect their collateral if a title challenge arises. Without so-called lender's title insurance, lenders generally will not provide a loan to finance or refinance a residential mortgage.

16.     California law requires that every title insurer file a rate schedule with the California State Insurance Commissioner. *See* Cal. Ins. Code § 12401.1. Defendant has filed a rate schedule entitled "First American Title Insurance Company; Residential Schedule of Fees" (the "Rate Manual") with the California Department of Insurance that, upon information and belief, was in effect at all times throughout the proposed class period. Plaintiffs take no position concerning the reasonableness of that rate filing and do not challenge it here. Rather, Plaintiffs bring this action to recover damages caused by Defendant's discriminatory application of certain discounts established in its Rate Manual. Furthermore, to the extent they are required to by California law, Plaintiffs have exhausted their applicable administrative remedies concerning these matters.

17.     Few know that title insurers such as Defendant generally price title policies according to a multi-tiered pricing structure. The so-called "basic insurance rate" is, as its name implies, the cornerstone of that pricing structure. Title insurers express their basic insurance rate in terms of premium dollar amount per unit of insurance coverage and use it (in one way or another) to calculate the price for each title insurance policy they sell. In California, Defendant calls its basic insurance rate the "Statewide Basic Insurance Rate; 'A'" (hereinafter referred to as

3

1   the "Basic Insurance Rate"). Under the terms of Defendant's Rate Manual, California

2   homeowners who purchase title insurance to cover their lenders in connection with home

3   refinancings are entitled to a significant discount on the Basic Insurance Rate as compared to the

4   rate charged for purchase financing. This discount goes by various names, but is most frequently

5   referenced as the "Refinance Rate." .

6          18.   Across the title insurance industry, Refinance Rates are significantly lower than

7   Basic Insurance Rates because a title insurer performs less work when preparing a refinance title

8   insurance policy than it does when preparing title insurance policies covering lenders who

9   finance initial home purchases. Refinance transactions generally occur when there has been no

10  change in ownership of a property and a short period of time has elapsed between the purchase

11  of the original title insurance policy and the refinance transaction. Refinance policies only insure

12  policyholders for title-related claims that arise during the time in between placement of the

13  policyholder's original policy and the refinance policy. As a result, title insurers typically rely on

14  the comprehensive title search conducted at the placement of the original policy – and thus spend

15  considerably less time and money conducting an updated title search for placement of a refinance

16  policy.

17         19.   Title insurers, including Defendant, have overcharged refinancing homeowners in

18  California and elsewhere for title insurance by selectively applying these Refinance Rate

19  discounts. The Executive Vice President of the title insurance industry's trade association, the

20  American Land Title Association ("ALTA"), has acknowledged publicly that "[w]e know not

21  everyone is familiar" with refinance rate discounts and that "[w]e know [overcharging] is a

22  problem." (Kenneth R. Harney, "Refinancers Should Seek Lower Rate on Title Insurance," The

23  Baltimore Sun, April 13, 2003, p. 1L.) Yet leaders of the title insurance industry, including

24  Defendant, continue to engage in such deceptive and self-serving pricing as a matter of routine

25  business practice.

26         20.   As used in this Complaint, "minority" or "minorities" shall refer to all non-

27  Caucasians and other minority racial groups who are protected under the FEHA, California

28  Government Code § 12900 et seq. As discussed further below, minority homeowners such as

1   Plaintiffs are dramatically concentrated in the "non-prime" mortgage lending market that

2   Defendant singles out for increased premiums.

3   ## DEFENDANT'S SELECTIVE APPLICATION
    ## OF ITS TITLE INSURANCE DISCOUNTS

4

5       21.     Defendant's Rate Manual includes two distinct refinance-related discount

6   provisions that may apply to refinancing homeowners in California: (1) Section C-13(a) provides

7   a substantial discount that can entail more than a 50% reduction from the Basic Insurance Rate;

8   and (2) Section C-13(b) provides a 30% discount from the Basic Insurance Rate.

9       22.     Defendant has engaged in disparate impact racial discrimination by

10  disproportionately denying the more substantial Refinance Rate discount in Section C-13(a) of

11  its Rate Manual to minority borrowers refinancing their homes.  In accordance with the Rate

12  Manual and as a matter of explicit company policy, Defendant denies the more generous of its

13  Refinance Rate discounts (the one appearing in Section C-13(a)) to refinancing homeowners in

14  cases where Defendant or its agents considers the homeowner's underlying financing to be "non-

15  prime." To wit, Defendant's Rate Manual states that the Refinance Rate discount "does not

16  apply to non-prime loans[.]"  The Rate Manual neither defines the term "non-prime" nor states

17  what criteria will or may be used to classify a loan as "non-prime" for purposes of determining

18  the premium to be charged.

19      23.     A wealth of market data – data that is exceedingly well-known throughout the

20  mortgage and title insurance industries – demonstrates a strong correlation between non-prime

21  mortgage financing and homeowner race and ethnicity.  This data indicates that minorities

22  receive non-prime mortgage financing far more often than do non-minority Caucasians.  In light

23  of this data, Defendant knew or should have known that its policy of denying its full Refinance

24  Rate discount to "non-prime" borrowers would disparately impact minorities purchasing lender's

25  title insurance from Defendant when refinancing their homes – causing them to pay disparately

26  more in the aggregate for the same First American title insurance products that were purchased

27  by similarly situated non-minority Caucasian customers of First American.

28      24.     This market data has long been well-known to Defendant and others in the

5

1   mortgage industry.  Nonetheless, Defendant – armed with such knowledge – elected to develop

2   and implement a title insurance sales policy directly based on the mortgage lending practices that

3   produced these striking disparities.

4        25.      Defendant during the recent housing boom priced lenders' refinance title

5   insurance policies with reference not just to the size of the underlying mortgage loan (a common

6   industry pricing practice and arguably a race-neutral method of title insurance pricing), but with

7   reference to Defendant's opinion of the *quality* of the financing associated with that loan (a

8   practice that, upon information and belief, is not employed by any other major American title

9   insurer).  And, as discussed above, the "non-prime" quality of a particular homeowner's

10  mortgage financing is closely correlated as an empirical matter with his or her race.

11       26.      In short, by routinely and systematically charging "non-prime" refinancing

12  homeowners more for lender's title insurance than other homeowners, Defendant in violation of

13  California and federal law has caused its minority title insurance purchasers to pay disparately

14  excessive title insurance premiums without any business necessity or justification for doing so.

15  **DEFENDANT FIRST AMERICAN'S TITLE INSURANCE**
**PRICING PRACTICES DISPARATELY IMPACT HOMEOWNERS**
16

17       27.      Defendant discriminates both by itself and through a network of licensed and

18  authorized title insurance agencies and agents.  Authorized title insurance agents and agencies

19  act as Defendant's agents in originating title insurance policies.  Authorized title insurance

20  agents and agencies agree with Defendant to originate title insurance policies in accordance with

21  Defendant's Rate Manual and to adhere to Defendant's policies and procedures with respect to

22  pricing title insurance premiums.

23       28.      Defendant and its authorized title insurance agents and agencies designed,

24  implemented, and adhered to title insurance pricing practices that caused minority homeowners

25  in California to purchase title insurance with excessive premiums and higher rates than similarly

26  situated non-minority homeowners.  This pattern of discrimination is not the result of random or

27  non-discriminatory factors.  Rather, it is a direct result of Defendant's business practices.

28

6

1    29.    Defendant implements its discriminatory title insurance pricing policy in a
2    number of ways, including actively educating its licensed title insurance agents and brokers
3    about Defendant's title insurance policies and procedures and systematically denying title
4    insurance refinance discounts to minority homeowners, who are disproportionately numbered
5    among those with "non-prime" mortgage loans.

6    30.    Further, while Defendant's use of a common pricing system for the title insurance
7    policies it sells might appear to be racially neutral, Defendant's denial of its full Refinance Rate
8    discount to "non-prime" homeowners inherently is non-neutral in the way it predictably and
9    adversely affects minority homeowners (relative to similarly situated non-minorities).   Minority
10   homeowners are vastly more likely than similarly situated non-minorities to have "non-prime"
11   home mortgage financing.   In denying its most generous lender's title insurance discount to
12   "non-prime" homeowners, Defendant virtually ensures that its minority customers will pay
13   disparately greater title insurance premiums than similarly situated non-minority customers pay
14   and thereby suffer discriminatory effects from Defendant's title insurance sales practices.

15   31.    The practices complained of herein were not necessary to the operation of
16   Defendant's business and did not effectively fulfill any significant business need or legitimate
17   business objective.   What type of loan a refinancing lender supplies to a homeowner is not a
18   valid or statistically sound predictor of the title insurance risk that particular homeowner poses,
19   and its use by Defendant as a price-setting factor is inexcusable given the well-known correlation
20   between non-prime mortgage financing and race in American mortgage lending and the
21   discriminatory effects of Defendant's practices on Plaintiffs and the Class.   At all times material
22   hereto, feasible alternatives to Defendant's discriminatory practices existed that would have
23   equally well or better accomplished Defendant's business purposes with less discriminatory
24   effects.

25   32.    Interestingly, materials concerning title insurance claims developed by the title
26   insurance industry's trade association, the American Land Title Association ("ALTA"), indicate
27   that homeowner loan quality is not a recognized title insurance risk.   Defendant is a member of
28   ALTA.

33.    Posted on ALTA's Internet site are materials relating to ALTA title insurance "risk codes." As ALTA puts it, "ALTA has developed various risk codes to allow title companies and underwriters to inventory and understand their claims experience, as well as identify trends and problem areas for loss prevention and training purposes." (http://www.alta.org/standards/risk.cfm (last viewed June 10, 2008).) ALTA's risk codes catalog the "Basic Risks" and "Special Risks" its member title insurers (including Defendant) face on incoming title insurance claims. Notably, "non-prime" or "sub-prime" lending is not included among these major title insurance risks.

34.    Title insurance industry claims patterns explain why that is so. The leading insurance industry rating firm A.M. Best Company ("Best") notes that, "title insurance [companies] experience[] a high frequency of low-dollar claims, occasionally generating a severe claim," that title insurance is a "relatively low risk" business and that the "bulk of title insurance claims occur shortly after closing and represent low-dollar costs." (http://www.alta.org/ indynews/Research/SR1101title.pdf (last viewed June 10, 2008).) For that reason, the Bloomberg financial news service reported that, even though many of America's "non-prime" borrowers today are in default on their loans (and were in 2007), Defendant and other major title insurers paid out less than 20% of their revenues in claims in 2007 "because title insurance claims aren't directly linked to slumping prices or whether mortgages get paid on time." (http://www.bloomberg.com/apps/news?pid=20601203&sid=asmjmzy64wLg&refer =insurance (last viewed June 10, 2008).)

## DEFENDANT FIRST AMERICAN IMPOSED EXCESSIVE AND DISCRIMINATORY PREMIUM CHARGES ON PLAINTIFFS

35.    Defendant's discriminatory title insurance pricing policy directly damaged Plaintiffs.

36.    On or about August 23, 2005, Plaintiffs refinanced the existing mortgage on their home in Richmond, California. Plaintiffs' lender in their August 23, 2005, refinancing was Countrywide Home Loans, Inc. ("Countrywide").

8

1    37.    The HUD-I Settlement Statement for Plaintiffs' August 23, 2005, refinancing

2    reflects that Plaintiffs paid off a prior Countrywide loan when they refinanced with Countrywide

3    on August 23, 2005.  Upon information and belief, Lenders Choice Title Company ("Lender's

4    Choice") supplied title insurance in connection with Plaintiffs' August 23, 2005, refinancing.

5    Upon information and belief, Lender's Choice is an authorized agent for Defendant and

6    conveyed a title insurance policy that was paid for by Plaintiffs and issued and underwritten by

7    Defendant in connection with Plaintiffs' August 23, 2005 home refinancing.

8    38.    Plaintiffs borrowed $387,200.00 from Countrywide in connection with their

9    August 23, 2005, refinance transaction, and the lender's title insurance policy they purchased

10   from Defendant covered Countrywide up to the amount of their (then-) new mortgage, $387,200.

11   39.    Plaintiffs' HUD-I Settlement Statement indicates that in connection with their

12   refinancing transaction, Plaintiffs paid a premium of $939.00 for the purchase of lender's title

13   insurance coverage from Defendant.

14   40.    Defendant did not provide Plaintiffs with a copy of its Rate Manual or with any

15   other information explaining how the amount of the premium was calculated.

16   41.    Upon information and belief, in calculating Plaintiffs' title insurance premium,

17   Defendant (itself or through its agent) determined that Countrywide's terms for providing credit

18   to Plaintiffs in the underlying refinance transaction were "non-prime" and accordingly sold

19   Plaintiffs title insurance without affording them the full Refinance Rate discount set out in

20   Section C-13(a) of Defendant's Rate Manual.  Had Defendant given Plaintiffs the full

21   refinancing premium discount set forth in its Rate Manual, Plaintiffs would have been charged

22   only $550.00 for their policy.

23   42.    Plaintiffs were damaged by the above-described conduct.

24   43.    There is no adequate or appropriate administrative remedy available to Plaintiffs

25   for redressing the claims asserted herein.  Pursuant to the Order of this Court entered January 12,

26   2009 and Insurance Code § 12414.13, on February 17, 2009 Plaintiffs presented the California

27   Insurance Commissioner with detailed information about their claims and requested the

28   Commissioner to either commence a hearing and investigation, or to issue an order declining to

9

1     exercise jurisdiction over this matter. On April 22, 2009, the Department of Insurance sent a

2     letter to Plaintiffs' counsel concluding that its jurisdiction in this case is primary rather than

3     exclusive, and that, "[a]fter a careful review of the circumstances in this case and the materials

4     submitted by the parties, the Commissioner has decided not to exercise jurisdiction in this

5     matter." A true and correct copy of that letter is attached hereto as Exhibit A.

6     **CLASS ACTION ALLEGATIONS**

7     44.     Plaintiffs bring this class action pursuant to California and federal law on behalf

8     of themselves and all minority customers of Defendant (the "Class") (hereinafter collectively

9     referred to as the "Class" or "members of the Class") in California who: (1) have purchased

10     lender's title insurance policies from Defendant (2) in connection with the refinancing of their

11     homes (3) during the period Defendant's California Rate Manual featuring the §C-13(a) and (b)

12     discounts was in effect ("Class Period"), and (4) to whom Defendant denied the full Refinance

13     Rate discount based on their underlying "non-prime" mortgage financing. Plaintiffs and

14     members of the Class have thus been subjected to disparate impact racial discrimination and

15     unlawful business practices, in violation of California law.

16     45.     Plaintiffs do not know the exact size of the Class or identities of the members of

17     the Class, since that information is in the exclusive control of Defendant. Plaintiffs believe that

18     the Class includes many thousands, or tens of thousands of individuals, who are geographically

19     dispersed throughout California. Therefore, the Class is so numerous that joinder of all members

20     is impracticable.

21     46.     All members of the Class have been subjected to and affected by Defendant's

22     practice of denying its full § C-13(a) Refinance Rate discount to borrowers deemed by

23     Defendant and its agents to have "non-prime" loans in their underlying refinance transactions.

24     There are questions of law and fact that are common to the Class, and that predominate over any

25     questions affecting only individual members of the Class. These questions include, but are not

26     limited to the following:

27

28

10

1         a.     the nature and scope of Defendant's policies and procedures concerning

2    the calculation of title insurance premiums and all applicable refinance discounts

3    available to title insurance applicants engaged in refinance transactions;

4         b.     whether Defendant denied Class Members the full benefit of its Refinance

5    Rate discount and thereby unlawfully discriminated against the Class;

6         c.     whether Defendant discriminated against Class Members by denying the

7    full Refinance Rate discount to homeowners whose underlying financing terms could

8    reasonably be interpreted or evaluated as "prime" in character;

9         d.     whether Defendant's title insurance pricing policies and procedures had a

10    discriminatory impact on minorities;

11         e.     whether Defendant's discriminatory practices were necessary to the

12    operation of its business and effectively carried out a significant business need or needs

13    or legitimate business justification of Defendant;

14         f.     whether Defendant's title insurance pricing policies and procedures

15    concerning denial of the full Refinance Rate discount to homeowners with "non-prime"

16    financing in refinance transactions have a disparate impact on minority homeowners;

17         g.     whether Defendant's conduct in charging excessive title insurance

18    premiums to minority homeowners in California refinancing their homes violated the

19    California Fair Employment and Housing Act, California Government Code §12955(i);

20         h.     whether Defendant's conduct in charging excessive title insurance

21    premiums to minority homeowners in California refinancing their homes violated the Fair

22    Housing Act, 42 U.S.C. § 3601;

23         i.     whether Defendant's conduct in charging excessive title insurance

24    premiums to minority homeowners in California violated California Business and

25    Professions Code §17200 because it was unlawful in that it violated California Insurance

26    Code §679.1 and/or the FEHA;

27

28

1          j.      whether there are feasible alternatives to Defendant's discriminatory

2  practices that would equally well or better accomplish the business purpose (if any) of

3  Defendant's challenged practices with a less discriminatory effect;

4          k.     whether the Court can award damages and restitution to Plaintiffs and the

5  Class; and

6          l.     the proper measure of relief to Plaintiffs and the Class.

7      47.    Plaintiffs' claims are typical of the claims of the Class, and do not conflict with

8  the interests of any other members of the Class in that both Plaintiffs, and the other members of

9  the Class, were subjected to the same acts of discrimination by Defendant.

10      48.    Plaintiffs will fairly and adequately represent the interests of the Class. Plaintiffs

11  are committed to vigorous prosecution of the Class's claims, and they have retained attorneys

12  who have extensive experience in consumer protection actions, discrimination actions and class

13  actions.

14      49.    Defendant has acted or refused to act on grounds generally applicable to the

15  Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with

16  respect to the class as a whole.

17      50.    A class action is superior to other methods for the speedy and efficient

18  adjudication of this controversy.  A class action regarding the issues in this case does not create

19  any problems of manageability.

20             **ACCRUAL, CONTINUING VIOLATION AND EQUITABLE TOLLING**

21      51.    Plaintiffs and Class Members did not know, and could not reasonably have

22  known, that they would receive from Defendant title insurance policies with inflated premiums

23  and discriminatory terms.  Their claims did not accrue until shortly before the filing of this

24  action.

25      52.    Defendant's discriminatory conduct was inherently self-concealing because,

26  among other things: (a) Defendant did not inform Plaintiffs how it determined the premium

27  charged for the lenders' title insurance policy they purchased; (b) Defendant did not provide

28  Plaintiffs with the Rate Manual or any other information from which they could have determined

1  how the premiums were calculated; (c) the Rate Manual does not explain how Defendant decides

2  whether a loan is or is not "non-prime;" and (d) the complex provisions of the Rate Manual are

3  well beyond the understanding of ordinary consumers such as the Plaintiffs. Defendant knew

4  that Plaintiffs and Class Members could not independently determine whether their subject loan

5  financing was or would be deemed "non-prime" by Defendant.

6          53.     Although well-known to Defendant, the fact that there is a high correlation

7  between a homeowner's race and the quality of the loan the homeowner receives was not known

8  to or reasonably discoverable by the Plaintiffs or Class Members. At the time they refinanced

9  their home, Plaintiffs had no reasonable ability independently to determine whether their title

10 insurance coverage was priced in a discriminatory way relative to that supplied to other similarly

11 situated non-minority refinancing homeowners.

12         54.     As a result of the foregoing, Plaintiffs and Class Members in the exercise of due

13 diligence could not have reasonably discovered the discriminatory practices at the time they

14 refinanced their homes. Plaintiffs did not discover this information until in or about March,

15 2008, when they began having problems paying their mortgage and consulted with financial

16 consultants and attorneys. For the reasons alleged above, the un-named members of the Class

17 still do not know that they have been and continue to be injured by Defendant's discriminatory

18 conduct.

19         55.     Defendant has committed discriminatory acts throughout the limitations period.

20 Class members who bought title insurance from Defendant during the applicable period of

21 limitations continue to be harmed by the excessive and discriminatory title insurance premiums

22 Defendant charged them. Plaintiffs in particular continue to be harmed by Defendant's

23 discriminatory overcharging. As Plaintiffs' HUD-I closing statement reflects, Plaintiffs fully

24 financed their excessive and discriminatory title insurance premium payment to Defendant with

25 part of the proceeds of their August 2005 refinance loan from Countrywide. Plaintiffs, in other

26 words, borrowed money from Countrywide (in part) in order to pay Defendant the title insurance

27 premium that is the subject of this lawsuit. Plaintiffs remain mortgagors on said Countrywide

28 mortgage loan today – and Defendant's wrongful acts thus continue to harm Plaintiffs, since

1   each month they pay wrongfully inflated interest on their loan as a result of Defendant's

2   discrimination.

3        56.     There is a substantial nexus between the acts of discrimination occurring within

4   the limitation periods prior to filing suit, and the acts of discrimination before that time. The acts

5   involve the same type of discrimination and are recurring, not isolated, events.

6        57.     Furthermore, Defendant may not invoke any otherwise applicable statutes of

7   limitations because Plaintiffs and members of the Class have been prevented from timely

8   pursuing their claims by sufficiently inequitable circumstances, and any delay on the part of

9   Plaintiffs and the Class in pursuing relief is therefore excusable.

10        58.     The statutes of limitations applicable to any claims that Plaintiffs or other Class

11   Members have brought or could bring as a result of the unlawful and fraudulent concealment and

12   course of conduct described herein, have been tolled as a result of Defendant's fraudulent

13   concealment. In addition, Plaintiffs and the Class did not discover and could not have

14   discovered their causes of action until the time alleged below, thereby tolling any applicable

15   statute of limitations.

16   ## COUNT I

17   ## VIOLATION OF FAIR HOUSING ACT, 42 U.S.C. § 3601, *ET. SEQ.*

18        59.     Plaintiffs repeat, re-allege and incorporate the allegations in paragraphs 1 through

19   58 above as if fully set forth herein.

20        60.     The sale of lender's title insurance on residential properties is a "residential real

21   estate-related transaction" within the meaning of the FHA. 42 U.S.C. § 3605(b). Plaintiffs and

22   the Class are members of a class or class of minority persons protected from housing

23   discrimination by the FHA.

24        61.     By systematically charging Plaintiffs and Class Members more for lender's title

25   insurance policies than it charged non-minority refinancing homeowners in California who

26   purchased lender's title insurance policies from Defendant, Defendant has discriminated against

27   Plaintiffs and members of the Class concerning their ability to participate in real estate-related

28

1    transactions, and in the terms and conditions of such transactions, in violation of the FHA.  42
2    U.S.C. § 3605(a).

3         62.    As a result of Defendant's discriminatory title insurance pricing-related policies
4    and procedures, Plaintiffs and other members of the Class paid more for lender's title insurance
5    than similarly situated non-minority refinancing California homeowners.

6         63.    Defendant's policy and procedure of giving discounts on lender's title insurance
7    policies to California homeowners refinancing with "prime" loans while denying those same
8    discounts to California homeowners refinancing with "non-prime" loans had a disparate impact
9    upon Plaintiffs and Class Members.  While these practices may be facially neutral within the
10   meaning of the civil rights laws, they had a significantly adverse and disproportionate impact on
11   California minority refinancing homeowners who purchased lender's title insurance policies
12   from Defendant that was directly and proximately produced by Defendant's title insurance
13   pricing-related policies and procedures.

14        64.    Defendant's practices were not reasonably necessary to achieve a legitimate
15   business objective.

16        65.    As a proximate result of Defendant's violation of 42 U.S.C. § 3605, Plaintiffs and
17   members of the Class have been injured and are entitled to declaratory relief and damages or
18   make-whole equitable relief.

19                              **COUNT II**
20               **VIOLATION OF CALIFORNIA FAIR EMPLOYMENT**
21   **AND HOUSING ACT, CALIFORNIA GOVERNMENT CODE §12900, et. seq.**

22        66.    Plaintiffs repeat, re-allege and incorporate the allegations in paragraphs 1 through
23   58 above as if fully set forth herein.

24        67.    The sale of residential lender's title insurance is a "real estate-related transaction"
25   within the meaning of the FEHA.  Cal. Gov. Code §12927(h)(1).  Plaintiffs' home refinancing
26   and their purchase of title insurance from Defendant was such a residential real estate-related
27   transaction.  Defendant is a "business establishment" within the meaning of the FEHA.  Cal.
28   Gov. Code §12955.8(b)(2).

15

68.     Plaintiffs are African-American residents of California, and are protected on account of their race by California law, including Section 51 of the California Civil Code and FEHA.

69.     The FEHA prohibits discrimination on account of "race, color, religion, sex, sexual orientation, marital status, national origin, ancestry, familial status, source of income, and disability." Cal. Gov. Code §§12920, 12955.

70.     It is unlawful under FEHA to discriminate on account of the above-described characteristics against any person in making available a real estate related transaction or in the terms and conditions of such transaction. Cal. Gov. Code §12955(i).

71.     Defendant by virtue of transacting substantial business in this County and throughout the State of California is subject to the provisions of Cal. Civ. Code §51. FEHA also prohibits anyone subject to the provisions of Cal. Civ. Code §51 from discriminating against "any person on the basis of sex, sexual orientation, color, race, religion, ancestry, national origin, familial status, marital status, disability, source of income, or on any other basis prohibited by that section." Cal. Gov. Code §12955(d).

72.     Under Cal. Gov. Code §12955, the definition of the terms "race, color, religion, sex, sexual orientation, marital status, national origin, ancestry, familial status, source of income, and disability" includes a perception that the person has or possesses any of those characteristics or that the person is associated with a person who has, or is perceived to have, any of those characteristics. Cal. Gov. Code §12955(m).

73.     Further, discrimination as defined by FEHA, includes and prohibits the "provision of inferior terms, conditions, privileges, facilities, or services in connection with [those] housing accommodations." Cal.Gov. Code §12927(c)(1).

74.     Defendant has violated all of these prohibitions with respect to Plaintiffs and the Class by charging minority homeowners with "non-prime" refinancing disparately high amounts for lender's title insurance relative to what Defendant charged non-minority Caucasian title insurance purchasers. Defendant has discriminated against Plaintiffs and members of the Class

16

1  concerning their ability to participate in real estate-related transactions and in the terms and

2  conditions of such transactions, in violation of the FEHA. Cal. Gov. Code §12955(i)

3      75.    Cal. Gov. Code §12955.8(b) permits injured parties to pursue claims for housing

4  discrimination under the disparate impact theory of liability. Defendant's title insurance pricing

5  policies and procedures – specifically, Defendant's denial of the full Refinance Rate reduction in

6  premium for lender's title insurance policies purchased by "non-prime" homeowners – had a

7  discriminatory disparate impact upon Plaintiffs and Class Members.

8      76.    As a proximate result of Defendant's violation of Cal. Gov. Code §§12920 and

9  12955, Plaintiffs and members of the Class have been directly and proximately injured and are

10  entitled to damages in an amount to be proven at trial.

11      77.    Plaintiffs and members of the Class ask this Court to declare the rights of the

12  parties herein regarding Defendant's obligation to provide title insurance without discriminating

13  against homeowners on account of their race, and to award Plaintiffs and the Class damages and

14  other relief as prayed for below.

15                          **COUNT III**

16              **VIOLATION OF CALIFORNIA BUSINESS**

17          **& PROFESSIONS CODE SECTION 17200, _et seq._**

18      78.    Plaintiffs hereby incorporate by reference each and every allegation contained in

19  paragraphs 1 through 70 of this Complaint as if fully rewritten herein.

20      79.    In selling its title insurance products to Plaintiffs and members of the Class as

21  described above, Defendant and its authorized agents engaged in unlawful business acts within

22  the meaning of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200

23  _et seq._ Defendant's failure to deal lawfully with Plaintiffs and the Class Members is part of a

24  regular business practice that violates the UCL.

25      80.    Defendant violated the UCL's prohibition against engaging in unlawful business

26  practices by discriminating against minority title insurance applicants as described herein and

27  thereby violating California Insurance Code §679.71, the FHA and the FEHA, as described

28  above.

81.    California Insurance Code § 679.71 prohibits insurers in California from issuing policies "under conditions less favorable to the insured than in other comparable cases, except for reasons applicable alike to persons of every marital status, sex, race, color, religion, national origin, or ancestry." It applies to "policies of insurance" that insure against "[l]oss of or damage to real property which is used primarily for residential purposes" and against "[l]egal liability of a natural person or persons for loss of, damage to, or injury to, persons or property." California Insurance Code § 679.70(a), (c).

82.    The title insurance policies that Plaintiffs and the Class purchased from Defendant were policies of insurance insuring against "[l]oss of or damage to real property which is used primarily for residential purposes" and/or "[l]egal liability of a natural person or persons for loss of, damage to, or injury to, persons or property."  The terms of those polices are and were less favorable than those in other comparable cases in that they required payment of a higher premium for the same coverage based upon the classification of the underlying loans as non-prime loans.  Given the critical mass of well-known industry data closely correlating homeowner "non-prime" refinancing loan quality and homeowner race, the distinction between prime and non-prime loans is not a "reason" "applicable alike to persons of every marital status, sex, race, color, religion, national origin, or ancestry."

83.    Plaintiffs and the Class were required to pay to Defendant, through their refinance transactions, the premiums for the lender's title insurance that was required in connection with those transactions. As a result of Defendant's conduct alleged herein, Plaintiffs and the Class suffered injury in fact and lost money or property because they paid more for such title insurance than they would have paid had defendant not denied them the lower refinance rate based upon the classification of their loans as a "non-prime" loans.

84.    Defendant's title insurance sales practices thus violated California Insurance Code §679.71, the FHA, the FEHA and the UCL. Plaintiffs and the Class proximately and directly suffered an ascertainable loss as a result of these violations in an amount to be proved at trial.

///

///

18

**PRAYER FOR RELIEF**

WHEREFORE PREMISES CONSIDERED, Plaintiffs request the following relief:

1.  An order determining that this action is a proper class action;

2.  A judgment awarding Plaintiffs and Class Members compensatory damages according to proof and/or make-whole equitable relief;

3.  A judgment granting Plaintiffs and Class Members restitution for their losses;

4.  An order finding and declaring that Defendant's acts and practices as challenged herein are unlawful;

5.  A judgment awarding Plaintiffs and Class Members costs and disbursements incurred in connection with this action, including reasonable attorneys' fees, costs and expenses; and

6.  A judgment or other order granting such other and further relief as the Court deems just and proper.

DATED:  August 24, 2009

        CHAVEZ & GERTLER LLP

        SCNEIDER WALLACE COTTRELL
        BRAYTON KONECKY LLP

        BONNETT, FAIRBOURN, FRIEDMAN
        & BALINT PC

        By: _Nance Becker_
           Nance F. Becker

        Attorneys for Plaintiffs
        MAPLE LYONS and JERRY LYONS

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT Case No. C 08-01850

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JURY DEMAND

Plaintiffs hereby demand a trial by jury of the maximum number allowed by law.

DATED:  August 24, 2009                        CHAVEZ & GERTLER LLP

                                               SCNEIDER WALLACE COTTRELL
                                               BRAYTON KONECKY LLP

                                               BONNETT, FAIRBOURN, FRIEDMAN &
                                               BALINT PC

                                               By:_____
                                                   Nance F. Becker

                                               Attorneys for Plaintiffs
                                               MAPLE LYONS and JERRY LYONS

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT Case No. C 08-01850

Exhibit E

1  JOEL D. SIEGEL (State Bar No. 155581)
   SONNENSCHEIN NATH & ROSENTHAL LLP
2  601 South Figueroa Street, Suite 2500
   Los Angeles, CA 90017-5704
3  Telephone: (213) 623-9300
   Facsimile: (213) 623-9924
4
   Attorneys for Defendant
5  First American Title Insurance Company

6

7

8                SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                       COUNTY OF CONTRA COSTA

10

11  MAPLE LYONS and JERRY LYONS,          Case No. C 08-01850
    individually and on behalf of all others similarly
12  situated
                                          NOTICE TO PLAINTIFFS AND ATTORNEYS
13              Plaintiffs,               OF RECORD OF REMOVAL TO FEDERAL
                                          COURT
14       vs.

15  FIRST AMERICAN TITLE INSURANCE
    COMPANY, a California Corporation, and
16  DOES 1-50, inclusive,

17              Defendants.

18

19       TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:

20       PLEASE TAKE NOTICE that, pursuant to 28 U.S.C. § 1441(b), 1441(c) and 1367(a),

21  defendant First American Title Insurance Company filed in the United States District Court for the

22  Northern District of California a Notice of Removal of the above-entitled action from the Superior

23  Court of the State of California, County of Contra Costa, to the United States District Court for the

24  Northern District of California and a Notice to State Court That Action Has Been Removed to

25  Federal Court.  True and correct copies without attachments of the Notice of Removal and the Notice

26  to State Court That Action Has Been Removed To Federal Court are attached hereto as Exhibit A.

27       PLEASE TAKE FURTHER NOTICE that this Notice and the Notice of Removal were filed

28  on September 8, 2009, with the Clerk of the Superior Court of the State of California, County of

                                         -1-

1   Contra Costa, which has effectuated this removal in accordance with 28 U.S.C. § 1446(d).  The

2   above-named Superior Court will proceed no further unless and until the action is remanded.  All

3   further proceedings in this action shall take place before the United States District Court for the

4   Northern District of California.

5

6   Dated:  September 8, 2009                    SONNENSCHEIN NATH & ROSENTHAL LLP

7

8

9                                               By: _____

                                                    JOEL D. SIEGEL
10

11                                              Attorneys for Defendant First American Title Insurance
                                                Company
12

13

14

15

16       30339712\V-1

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit A

1 JOEL D. SIEGEL (State Bar No. 155581)
  SONNENSCHEIN NATH & ROSENTHAL LLP
2 601 South Figueroa Street, Suite 2500
  Los Angeles, CA 90017-5704
3 Telephone: (213) 623-9300
  Facsimile: (213) 623-9924
4   jsiegel@sonnenschein.com

5 Attorneys for Defendant
  First American Title Insurance Company

6

7

8      UNITED STATES DISTRICT COURT

9     FOR THE NORTHERN DISTRICT OF CALIFORNIA

10      SAN FRANCISCO/ OAKLAND DIVISION

11

| | |
|---|---|
| 12 MAPLE LYONS and JERRY LYONS,<br>individually and on behalf of all others similarly<br>13 situated | Case No. |
| 14     Plaintiffs, | NOTICE OF REMOVAL OF CIVIL ACTION<br>UNDER 28 U.S.C. § 1441(b) |
| 15   vs. | (FEDERAL QUESTION JURISDICTION) |
| 16 FIRST AMERICAN TITLE INSURANCE<br>COMPANY, a California Corporation, and<br>17 DOES 1-50, inclusive, | |
| 18    Defendants. | |
| 19 | |

20

21   TO THE CLERK OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN

22 DISTRICT OF CALIFORNIA:

23   PLEASE TAKE NOTICE that defendant First American Title Insurance Company ("First

24 American") hereby removes the above-captioned action from the Superior Court of the State of

25 California, County of Contra Costa, to this Court pursuant to 28 U.S.C. § 1441(b), 1441(c), and

26 1367(a).  In support thereof, First American states as follows:

27   1.  On July 22, 2008, an action was commenced in the Superior Court of the State of

28 California, County of Contra Costa, entitled *Maple and Jerry Lyons v. First American, individually*

Notice of Removal

1   *and on behalf of all others similarly situated, v. First American Title Insurance Company, a*

2   *California Corporation, and Does 1-50, inclusive*, Case No. C 08-01850.  A true and correct copy of

3   this Complaint is attached as Exhibit A.

4       2.   A true and correct copy of plaintiffs' First Amended Complaint is attached as Exhibit

5   B.

6       3.   On August 28, 2009, the Court entered an order permitting plaintiffs to file a Second

7   Amended Complaint, which purports to state a cause of action for violation of 42 U.S.C. § 3601 *et*

8   *seq.* (the Fair Housing Act).  A true and correct copy of this signed order is attached hereto as Exhibit

9   C.

10      4.   A true and correct copy of plaintiffs' Second Amended Complaint is attached hereto

11  as Exhibit D.  Pursuant to the Court's Order of August 28, 2009, the Second Amended Complaint

12  was deemed filed on August 28, 2009.

13      5.   Plaintiffs' purported cause of action for violation of 42 U.S.C. § 3601 *et seq.* (the Fair

14  Housing Act) was not included in plaintiffs' prior complaints.  Compare Exhibits A, B, and D.

15      6.   The action is currently pending in the Superior Court for the State of California,

16  County of Contra Costa, whose venue is embraced by this Court under 28 U.S.C. § 1441(a).

17      7.   This Notice of Removal is timely filed within thirty days of receipt of the "pleading,

18  motion, order or other paper" from which removability was first ascertained. 28 U.S.C. § 1446(b).

19      8.   True and correct copies of all pleadings, process, and orders in this action are attached

20  to First American's Appendix in Support of Notice of Removal, filed concurrently herewith pursuant

21  to 28 U.S.C. § 1446(a).

22      9.   A Notice to Plainiffs and Attorneys of Record of Removal of Civil Action to United

23  States District Court is being served by First American upon plaintiffs and filed with the Clerk of the

24  Superior Court for the State of California, County of Contra Costa.  A true and correct copy of the

25  Notice is attached hereto as Exhibit E.

26                                  **JURISDICTION**

27      10.   This is a civil action of which this Court has original jurisdiction under 28 U.S.C. §

28  1331, and is one that may be properly removed to this Court pursuant to the provisions of 28 U.S.C. §

Notice of Removal

1441(b), in that it alleges claims for relief under the Fair Housing Act (42 U.S.C. § 3601 *et seq.*) which arise under the laws of the United States.

      11.    This Court has supplemental jurisdiction as to all other claims for relief pursuant to 28 U.S.C. § 1367(a) since all such claims allege a common nucleus of operative facts as the claims for relief under 42 U.S.C. § 3601 *et seq.* and are so related to the Fair Housing Act claims that they form part of the same case or controversy under Article III of the United States Constitution.

**INTRADISTRICT ASSIGNMENT**

      12.    The action is currently pending in the Superior Court for the State of California, County of Contra Costa, whose venue is embraced by this Court under 28 U.S.C. § 1441(a). Pursuant to local rule 3-2(d), this action shall be assigned to the San Francisco or the Oakland division, as the action arises in Contra Costa County.

Dated: September 8, 2009           SONNENSCHEIN NATH & ROSENTHAL LLP

By: _____
    JOEL D. SIEGEL

Attorneys for Defendant First American Title Insurance Company

Notice of Removal

JOEL D. SIEGEL (State Bar No. 155581)
SONNENSCHEIN NATH & ROSENTHAL LLP
601 South Figueroa Street, Suite 2500
Los Angeles, CA 90017-5704
Telephone: (213) 623-9300
Facsimile: (213) 623-9924

Attorneys for Defendant
First American Title Insurance Company

SONNENSCHEIN NATH & ROSENTHAL LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF CONTRA COSTA

| | |
|---|---|
| MAPLE LYONS and JERRY LYONS, individually and on behalf of all others similarly situated<br><br>            Plaintiffs,<br><br>vs.<br><br>FIRST AMERICAN TITLE INSURANCE COMPANY, a California Corporation, and DOES 1-50, inclusive,<br>            Defendants. | Case No. 08-10850<br><br>NOTICE TO STATE COURT THAT ACTION HAS BEEN REMOVED TO FEDERAL COURT |

TO THE CLERK OF THE ABOVE COURT:

PLEASE TAKE NOTICE THAT, on September 8, 2009, defendant First American Title Insurance Company removed this action to the United States District Court for the Northern District of California, pursuant to 28 U.S.C. sections 1441(b), 1441(c), and 1367(a). A copy of the Notice Of Removal Of Civil Action (without exhibits) is attached hereto as Exhibit "A".

PLEASE TAKE FURTHER NOTICE that, pursuant to 28 U.S.C. section 1446(d), filing the Notice Of Removal Of Civil Action in the United States District Court followed by filing this notice with this Court effected the removal of this action, and this Court may not proceed further unless and until the action is remanded.

/ / /

/ / /

- 1 -
FIRST AMERICAN TITLE INSURANCE CO.'S NOTICE OF REMOVAL TO STATE COURT

1   Dated:  September 8, 2009

2

SONNENSCHEIN NATH & ROSENTHAL LLP

3

4   By_____
JOEL D. SIEGEL

5   Attorneys for Defendant First American Title
Insurance Company

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SONNENSCHEIN NATH & ROSENTHAL LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

FIRST AMERICAN TITLE INSURANCE CO.'S NOTICE OF REMOVAL TO STATE COURT